*In re* MARRIAGE OF YISRAEL PICKHOLTZ, Petitioner-Appellee, and SHARON PICKHOLTZ CHAMBERS, Respondent-Appellant (Continental Illinois National Bank, Party Respondent).

First District (2nd Division)   No. 87—3706

Opinion filed December 30, 1988.—Rehearing denied January 26, 1989.

514

Kalcheim, Schatz & Berger, of Chicago, for appellant.

Greenberg, Keele, Lunn & Aronberg, of Chicago (Nathan H. Lichtenstein, of counsel), for appellee.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Respondent Sharon Pickholtz Chambers (Sharon) appeals from the circuit court's denial of her amended petition to increase child support and amended post-trial motion seeking further relief, and asks this court to determine whether these denials constituted an abuse of the circuit court's discretion.

A divorce agreement, dated July 5, 1979, between Sharon and petitioner Yisrael Pickholtz (Yisrael) was entered as a judgment on December 17, 1979, in the District Rabbinical Court in Beersheba, Israel. By agreed order entered May 4, 1981 (1981 order or order), the circuit court of Cook County enrolled and established the Beersheba judgment for the purpose of enforcing and modifying its custody and parental visitation provisions, and incorporated the following findings: (1) Sharon and Yisrael married in 1971; (2) they moved to Israel in 1973; (3) two children, Yerachmiel and Merav-Yehudit (Merav), were born to the Pickholtzes in 1973 and 1976, respectively; and (4) the Pickholtzes divorced in 1979. Sharon and both children moved to the United States in 1980, where she remarried in 1981.

The 1981 order also granted Sharon full custody of the children, allowing them biannual visits with their father in Israel and permitting Yisrael to travel to the United States for the purpose of exercising additional visitation rights. In the order, the parties expressed a desire that the children "be reared in traditional Jewish values" and that they "attend Jewish parochial schools unless there is a bona fide reason why they should not."

Noting that "Yisrael *** is a man of modest means and does not have the financial ability to pay the costs and expenses of the transportation which the visitation schedule *** will entail," the order additionally set forth the parties' financial agreement whereby: (1) Sharon would deposit $80,000 in an escrow account to remain in effect until 1994 when Merav turns 18; (2) upon expiration, the account would be liquidated and Yisrael would receive $40,000 as his sole property; (3) Sharon guaranteed that the annual net income or "payable net income" on the escrowed funds would equal at least $10,000; (4) up to $11,600 of the payable net income would be used: (a) to pay for all airline tickets purchased by Yisrael and the children in furtherance of Yisrael's visitation rights; and (b) for support and maintenance of the children during the time they spent with their father in Israel and the United States; (5) any payable net income remaining would become Yisrael's "sole and separate property"; and (6) Sharon could claim any income earned on the escrowed funds, less the payable net income. The order also obligated Sharon to pay all escrow fees and costs relating to the escrow agreement and any cost of airline tickets not satisfied by the payable net income. Yisrael was required to pay 1,377 Israeli shekels per month for child support; any additional money needed to support the children had to be supplied by Sharon. Finally, in the event either party attempted to modify the terms of the order or petitioned to increase child support payments, the opposite party would be entitled to receive the entire escrowed funds.

Sharon in 1984 petitioned the circuit court to declare void paragraphs 5 through 9 of the order, requiring Sharon to "fund a trust essentially for the benefit of Yisrael" and precluding her from seeking additional child support, and to join the escrowee, Continental Illinois National Bank, as a party defendant to the lawsuit. On May 6, 1986, the provisions of the order which made awards for child support and education expenses nonmodifiable and prescribed forfeiture of Sharon's interest in the funds should she seek modification of the order were declared void and nonbinding.

Sharon additionally filed an amended petition for increased child

support, citing sections 503(g) and 513 of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (Ill. Rev. Stat. 1987, ch. 40, pars. 503(g), 513), and alleging the occurrence of "a substantial and material change in [the parties'] circumstances creating a substantial imbalance between the needs of the minor children and the ability of the parties to pay support and warranting an increase in Yisrael's *** child support obligation," which included a decrease in the parties' ability to pay the escalating costs of the children's support and private education. Also sought was the court's protection and promotion of the children's best interests by requiring Yisrael's realistic fulfillment of his child support obligation; and therefore, money currently held in escrow should be set aside in a separate fund to annually disburse $12,000 in income and principal to pay the children's education and transportation expenses until Merav reaches 21 years of age.

Following hearings, the court entered an order on September 29, 1986. Pursuant to Sharon's motions to amend the order to conform to the court's ruling, on July 9, 1987, the court vacated the September 29 order and found: (1) a substantial and material change in the parties' circumstances since the entry of the 1981 order, as economic conditions in Israel rendered the child support payments in shekels "virtually valueless"; (2) Yisrael was precluded from paying increased child support to Sharon from his present employment income because of his current obligations to his second family in Israel; (3) the 1981 order was valid and binding; (4) the contractual agreements of the parties contained in the 1981 order should be preserved and adhered to; (5) the 1981 order embodies the parties' agreement that the children should receive a traditional Jewish education; (6) the escrow account held accumulated interest after payment of transportation expenses to date; and (7) except as otherwise provided in this and the May 6, 1986, order, relief requested in Sharon's petition for declaratory judgment and petition and amended petition for increased child support was denied.

Pursuant to Sharon's motion for reconsideration, the court entered yet another order on August 18, 1987, ruling that in accord with the 1981 order, the earnings available from the escrow account must finance visitation expenses for Yisrael and the children, but income in excess of that needed for airfare and related expenses must be used to meet the children's financial needs; if earnings or income from the escrow account prove insufficient, the principal of the fund will be invaded to compensate any deficiency; and as of September 1986, the fund contained $113,605.50. Yisrael will continued to pay child support as prescribed by the 1981 order and, in addition, $2,400

per year will be withdrawn from the account for child support and $3,000 per year for parochial school tuition and for the expense of sending the children to religious summer camp. The terms of this order are to remain in effect from 1982 through 1994, except that in 1992 the child support payments will be reduced to $1,800 per year, and the payments for educational and related expenses will be $2,000 per year. The court also ordered that all previous judgments, orders and agreements between the parties remain in effect except as modified by the present order, and Sharon remain responsible for payment of the escrow administrative costs and for the airfare of individuals escorting the children to and from Israel.

By an agreed order entered November 19, 1987, the court found no just reason to delay enforcement or appeal of the August 18, 1987, order. Sharon appeals.

I

Sharon assigns as an abuse of discretion the court's denial of her amended motion to establish a trust pursuant to sections 503(g) and 513 of the IMDMA. Sharon insists the court should transfer money now in the escrow account to a separate trust to pay for the children's support, education and religious summer camp expenses, and the payments envisioned by the August 18 order are inadequate to satisfy the children's needs.

■■ Section 503(g) permits a court, if necessary, to set aside a portion of the jointly or separately held estates of the parties in a separate fund or trust for the support, maintenance, education and general welfare of any minor. In deciding whether to create a section 503(g) trust or fund, the circuit court must initially determine whether the fund is necessary to promote and protect the best interests of the children. (*Atkinson v. Atkinson* (1981), 87 Ill. 2d 174, 179, 429 N.E.2d 465; *In re Marriage of Bates* (1986), 141 Ill. App. 3d 566, 571, 490 N.E.2d 1014.) Application of section 503(g) also demands evidence of a demonstrated unwillingness or inability by a parent to make direct payments of child support. See *Atkinson v. Atkinson*, 87 Ill. 2d at 179; *In re Marriage of Rochford* (1980), 91 Ill. App. 3d 769, 782, 414 N.E.2d 1096.

■■ Yisrael contests Sharon's entitlement to any alteration in the current child support scheme because she failed to prove the substantial change in circumstances necessary under IMDMA section 510(a) to modify the 1981 order. (Ill. Rev. Stat. 1987, ch. 40, par. 510(a); see also *Harner v. Harner* (1982), 105 Ill. App. 3d 430, 434, 434 N.E.2d 465.) Under recent decisions, however, the petitioner's burden under

section 510(a) is to show a "substantial imbalance" between the supporting (noncustodial) parent's capabilities and the child's needs. See *In re Marriage of Boyden* (1987), 164 Ill. App. 3d 385, 387, 517 N.E.2d 1144; *Ingwerson v. Woeckener* (1986), 141 Ill. App. 3d 647, 649, 490 N.E.2d 1008.

In the case *sub judice*, Yisrael testified he couldn't recall his 1981 income, but as to his present financial situation he averred: (1) he lives with his second wife and seven children in Israel; (2) three are Yisrael's natural children, all born since May 1981, three are his second wife's children by a previous marriage and one is a disabled ward; (3) his wife receives $270 a month in child support; (4) he receives $180 to $200 a month from the State for care of the ward; (5) all but one of the school-age children are in parochial school; (6) he earns approximately $850 a month "when [he works] a full month" and has no other source of income; and (7) his annual income plus the support received from the State and child support received by his wife are insufficient to provide for his second family. The current exchange rate for 1,377 shekels is approximately 80 cents and since 1981, he has made no direct contributions to the support of Merav and Yerachmiel beyond the required 1,377 shekels per month. In the first year after entry of the 1981 order, he received from the escrow account payable net income approximately $5,000 over and above that needed to purchase airline tickets; some of that income was used for personal living expenses, some was spent in connection with his visits to the United States. On their visits to Israel in 1982-86, Yerachmiel and Merav stayed at Yisrael's home; when Yisrael travelled to the United States in those same years, he virtually always stayed with relatives and was never charged room and board.

Yisrael has no objections to Yerachmiel attending a religious summer camp and believes it is "good" for both children to do so; he also believes that attendance at a parochial school will promote development of traditional Jewish values and it is his desire that the children continue their parochial school education while in the United States "to the extent that it is possible." Money for the parochial school tuitions has not come from him. He objects to "principal payments" for the children's airfare and education coming from the escrow account and maintains it couldn't be achieved without jeopardizing "all of the basic intents of the original agreement."

Sharon's mother, Esther Robinson, tendered cancelled checks to substantiate her statement that she had loaned Sharon $34,939 since 1981 to pay for, *inter alia*, the children's clothing, education, religious summer camp expenses and escorts to Israel. Robinson asserted the

payments were loans, not gifts, but lacked documentary proof.

Sharon testified that after she returned to the United States and prior to the entry of the 1981 order, she and the children lived at her parents' home, paying no bills for utilities, food or rent. In 1981, Sharon was employed as a job developer for the City Colleges of Chicago; she worked a 40-hour week and earned $14,400 per year. The position was terminated in February 1982 due to lack of funding. She sought employment elsewhere and collected unemployment benefits for six months. Unable to find work paying a salary above the minimum wage, Sharon enrolled in graduate school at Loyola University of Chicago in August 1982 and graduated with a masters degree in social work in May 1985. Sharon remarried in 1981 and had a third child in August 1985. Because she cares for her youngest child on a full-time basis, she has, since 1985, worked only four hours per week, earning a net income to date of approximately $3,300. She is employed by her mother as a clinical social worker. In 1981: (1) Sharon purchased all her children's clothing with her own money; (2) only Yerachmiel attended parochial school; (3) tuition was $850 per year; and (4) day-care expenses for Merav totalled $95 every two weeks. The parties stipulated that 1,377 shekels were worth approximately $150 in 1981.

Sharon swore that, as of the date of the trial, she purchased her children's clothing with loans from her mother, none of which she had repaid. Sharon could not recall her children's clothing expenses in 1981, but could affirm that the smaller-sized clothing worn by Merav and Yerachmiel seven years ago cost less than clothes they wear now; Yerachmiel presently requires men's-sized clothing; the preteen sizes needed to outfit Merav considerably exceed girls' clothes in price; and the quantity and frequency of clothes purchases have increased since 1981. Additional expenses presently incurred by the teenagers did not exist in 1981. She further maintained that she had financed the ordinary living expenses of her children since 1981, but would not have been able to do so without aid from her mother and current husband.

Producing an itemized affidavit detailing monthly expenses incurred by the children, Sharon explained that Merav and Yerachmiel account for 33% or $717 of the "joint family expenses," in addition to the children's separate, monthly expenses; from these figures, Sharon established that the children's average monthly expenses total $2,324.87. This evidence distinguishes this case from *Harner v. Harner* (105 Ill. App. 3d at 434-35), upon which Yisrael relies. Yisrael presented no contradictory evidence.

Sharon averred it is important that she raise Merav and Yerach-

miel with traditional Jewish values; they must be sent to parochial schools and participate in activities designed to promote orthodox Jewish values, such as youth groups and religiously oriented summer camps.

■ The aforementioned evidence clearly establishes a substantial imbalance between the children's expenses and their natural parents' ability to satisfy those needs. Although Yisrael stated he could not recall his 1981 income, he also testified to the formidable expansion of his family since 1981, the corresponding devaluation of the Israeli currency[1] and his modest income. Sharon, moreover, presented evidence that the children's combined expenses currently total approximately $28,000 per year and demonstrated that due to the loss of her job and the birth of her third child, her financial and employment position suffered significantly.

Yisrael attacks Sharon's evidence of a change in Yerachmiel's and Merav's living expenses as conclusory and undocumented; however, Sharon and Esther Robinson concurred that Sharon paid her children's ordinary living expenses in 1981; Sharon can no longer pay these expenses; and Robinson produced several cancelled checks, exceeding $34,000, documenting the money Sharon used to pay for the teenagers' clothes, educational and camp expenses.

As to the propriety of establishing a discrete trust pursuant to section 503(g), the evidence related above illustrates Yisrael's inability to render direct child support payments to his first family; his personal income equals approximately $10,000 a year, a small sum on which to raise a family of nine, even with the monthly supplements received for the benefit of his stepchildren and ward. Sharon demonstrated, moreover, the imperative of establishing a trust to protect the children's best interests. Both parties expressed a desire in 1981 that Merav and Yerachmiel receive a private education.

■ Yisrael correctly observes that the court in *In re Marriage of Bates* (141 Ill. App. 3d 566) condoned a father's attempt to shelter his income rather than finance his children's private education. Lacking in *Bates*, however, was evidence of sincere religious beliefs, as are present in this case, prompting a desire for private education. Furthermore, money sought in the case at bar is accumulated interest from an escrow account funded solely by Sharon; Sharon seeks no increase in direct payments from Yisrael and concedes that any trust or

---

[1]In 1983, Sharon stopped withdrawing the monthly support payments deposited by Yisrael in an Israeli bank because the $60 charge to telex the funds to the United States exceeded the value of the shekels themselves.

fund established under section 503(g) must continue to pay all transportation and related visitation costs incurred by Yisrael and the children, until Merav achieves majority.[2]

■ Yisrael argues that the clean hands doctrine bars Sharon from demanding that the court create a separate trust for the children's financial needs, citing *Edwards v. Edwards* (1970), 125 Ill. App. 2d 91, 96, 259 N.E.2d 820. Yisrael seeks to impose the doctrine for Sharon's alleged violations of the 1979 divorce decree and orders entered by Israeli courts pursuant to that decree; these orders are entirely unrelated to the issues raised in the present appeal. Moreover, Yisrael admits that Sharon has not "defaulted" on the 1981 order. Yisrael's argument merits no further consideration. *Comedy Cottage, Inc. v. Berk* (1986), 145 Ill. App. 3d 355, 362, 495 N.E.2d 1006.

II

Sharon next contends the court abused its discretion in denying her relief from the responsibility of paying airfare for escorts for her children and the costs of administering the escrow account. Sharon acknowledges that the 1981 order expressly imposes the burden of these costs on her; nevertheless, she maintains that since the entry of the order these expenses have been paid with money withdrawn from the escrow account, pursuant to agreed, written orders.

■ Yisrael responds that Sharon waived this issue by neglecting to raise it during the proceedings below. The record, however, reveals that: (1) Sharon testified at trial regarding the children's need for an escort during their flights to and from Israel; (2) Sharon moved the court to modify these provisions on June 18, 1987; and (3) in its August 18, 1987, order, the court denied Sharon's request. Raising an issue by post-trial motion preserves the question for appellate consideration. *Burgdorff v. International Business Machines Corp.* (1979), 74 Ill. App. 3d 158, 162, 392 N.E.2d 183.

■ In *Blisset v. Blisset* (1988), 123 Ill. 2d 161, 167-68, 526 N.E.2d 125, the supreme court disapproved informal waivers of child

---

[2]A statute recently enacted permits courts to order the withholding of income from virtually any source where the recipient of that income fails to render timely payment of court-ordered child support. (See Ill. Rev. Stat. 1987, ch. 40, par. 1107.1.) The statute demonstrates this State's policy of elevating the needs of its minors above their parents' personal pecuniary interests. A policy so plainly articulated underscores the reasonableness of and necessity for establishing the proposed trust, which is undeniably fair in its terms, and would assure the children full access to a ready and bountiful source of income without significant departure from the original intent of the escrow. See *Ingwerson v. Woeckener*, 141 Ill. App. 3d at 649-50.

522

support obligations, emphasizing that "parents may create an enforceable agreement for modification of child support only by petitioning the court for support modification." Any *de facto* agreement between Sharon and Yisrael to alter child support obligations, assuming such a consensus was reached, is therefore meaningless absent court approval of the modification. On remand, the circuit court should consider whether these expenses must be included in costs compensated by a section 503(g) trust or fund.

Reversed and remanded.

SCARIANO and EGAN, JJ., concur.