*In re* MARRIAGE OF MICHAEL MEHRING, Petitioner, and JULIE MEHRING, Respondent-Appellant (Ella Mehring, Intervenor-Appellee).

Fifth District    No. 5—00—0057

Opinion filed August 13, 2001.—Rehearing denied September 12, 2001.

GOLDENHERSH, J., specially concurring.

Lance B. Freezeland, of Effingham, for appellant.

Margaret J. Walsh, of Strellis, Faulbaum, Walsh & Field, of Belleville, for appellee.

PRESIDING JUSTICE CHAPMAN delivered the opinion of the court:

This case began with the basic question of whether a nine-year-old girl should be allowed to visit her paternal grandmother. The broader question presented is whether the grandparental-visitation statute (750 ILCS 5/607(b)(1) (West 2000)) is unconstitutional as violative of a parent's liberty rights guaranteed by the fourteenth amendment to the United States Constitution and article I, section 2, of the Illinois Constitution. We will first examine the constitutional question.

"War is much too serious to leave to the generals."[1]

Clemenceau's challenge should not have gone unanswered. If Napoleon were alive, he might have responded, "Right, it's too serious for us, until the time for killing comes." The dispute over choosing decision makers for nations is echoed on a smaller, but no less significant scale, in choosing decision makers for family disputes.

Few would argue that the wars-are-too-important epigram could be analogized in reduced scope to "Families are too important to be left to the courts." Even judges would generally agree with this bit of wisdom when it is applied to most families at most times. The problem, however, is not with the millions of parental decisions made each day, decisions that are never criticized, questioned, or even examined by any outside authority, let alone the judicial system. The problem arises with those relatively limited number of decisions that courts make with much less exuberance than is manifested in Napoleon's hypothetical response.

Napoleon's response is a recognition of the fact that when diplomacy has failed and a dispute still exists that must be resolved, the "time for killing" has come and those who are skilled in the art of war must be given the right to decide. Similarly, in families in which the normal decision-making process has failed for whatever reason

---

[1] J. Bartlett, Bartlett's Familiar Quotations 401 (15th ed. 1980).

(death and divorce are but two), courts are called upon to resolve the dispute. Some generals, like Patton, may relish the chance and even revel in the bloody battles they direct. Most do not. Some judges may feel they are actually in a superior position to make life-changing decisions involving family choices. Most do not. The similarity between generals and judges in this context is that, whether they want to make the decisions or not, they must. The reasons for generals becoming the ultimate decision makers are far beyond the scope of this opinion, but the reasons for judges being called upon to resolve family disputes bear further examination.

Adam and Eve's children had no grandparents, and although Cain and Abel's relationship with each other left a lot to be desired, there is no indication that grandparental visitation was a problem at that time. Nor was it a problem for the next several thousand years. Why is this true? Could it be that, for most of that time, families included grandparents as a part of the basic family unit? In both tribal units and in subsistence farming societies, this would appear to be true, and if it is, it is also true that the extended family has been the norm for thousands of generations longer than the nuclear-family model that is presented as the norm today. See K. Franklin, *"A Family Like Any Other Family": Alternative Methods of Defining Family Law*, 18 N.Y.U. Rev. L. & Soc. Change 1027 (1990/1991) (an interesting discussion on the development of the nuclear family).

Even though the nuclear family may be of relatively recent vintage, it has been accepted as the norm for more than 100 years. Under the nuclear-family model, parents have decision-making powers over most elements of their children's lives. The decision-making power has been recognized as a fundamental right. See *Troxel v. Granville*, 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000); *Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 69 L. Ed. 1070, 45 S. Ct. 571 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625 (1923); *Lulay v. Lulay*, 193 Ill. 2d 455, 739 N.E.2d 521 (2000). Although it is a fundamental right, it is not an absolute one. *Prince v. Massachusetts*, 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438 (1944).

The state's interference with parental powers begins even before the nuclear family is formed. For example, Illinois has prohibited bigamy for many years. 720 ILCS 5/11—12 (West 2000). The state's interference with parental power over children begins with each child's birth. *E.g.*, 410 ILCS 240/1 (West 2000) (requiring testing for phenylketonuria at birth); 410 ILCS 320/1 (West 2000) (requiring testing for syphilis). The interference continues during the child's early years. *E.g.*, 410 ILCS 315/2 (West 2000) (requiring immunization of all chil-

dren for diphtheria, pertussis, and tetanus); 410 ILCS 205/1 *et seq.* (West 2000) (requiring children to receive hearing and visual examinations). In fact, the state's interference continues throughout the child's life. *E.g.*, 105 ILCS 5/26—1 *et seq.* (West 2000) (requiring parents to keep their children in school); 820 ILCS 205/1 *et seq.* (West 2000) (prohibiting parents from putting their children into the labor force). This list of civil interferences is not the only state action that restricts parental power. The state also has criminal sanctions for certain conduct. *E.g.*, 720 ILCS 5/11—11 (West 2000) (prohibiting incest). Although all the above interferences have a statutory basis, the state has also intervened through its judicial arm in cases involving necessary medical care that parents have refused for religious reasons. *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 104 N.E.2d 769 (1952) (requiring blood transfusions for a child over the parents' objections). One drastic interference with parental powers is the removal of children from the home and their placement with foster parents because of their natural parents' neglect or mistreatment. See 705 ILCS 405/2—5 (West 2000). The ultimate interference is the termination of parental rights. See 750 ILCS 50/1 *et seq.* (West 2000).

The existence of the foregoing list of sanctioned state interferences with parental rights establishes that parents' power over their children is far from absolute and implicitly raises this question: If all these interferences are allowed, what is the problem with the grandparental-visitation statute?

●1 The grandparental-visitation statute provides:

"(b)(1) The court may grant reasonable visitation privileges to a grandparent *** of any minor child *** if the court determines that it is in the best interests and welfare of the child ***. *** [A] petition for visitation privileges may be filed under this paragraph (1) *** if one or more of the following circumstances exist:

(A) the parents are not currently cohabiting on a permanent or an indefinite basis;

(B) one of the parents has been absent from the marital abode for more than one month without the spouse knowing his or her whereabouts;

(C) one of the parents is deceased;

(D) one of the parents joins in the petition with the grandparents, great-grandparents, or sibling; or

(E) a sibling is in State custody." 750 ILCS 5/607(b)(1) (West 2000).

This court ruled on a constitutional challenge to this statute in *West v. West*, 294 Ill. App. 3d 356, 689 N.E.2d 1215 (1998). *West* reviewed the statutory provisions, along with the cases that had allowed visitation before the statute was passed, and concluded that the

statute was both a codification and an expansion of grandparents' visitation rights. In addition, *West* held that the statute was constitutional because it was narrowly tailored to achieve the goal of maintaining and promoting a grandparent-grandchild relationship, a matter in which the state had a compelling interest.

●2 Why then is this statute being challenged again? Because, the appellant replies, in the interim the United States Supreme Court decided *Troxel v. Granville*, 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000), and the Illinois Supreme Court decided *Lulay v. Lulay*, 193 Ill. 2d 455, 739 N.E.2d 521 (2000). The first case held Washington State's grandparental-visitation statute unconstitutional. The second case held the Illinois statute unconstitutional under the particular circumstances of that case.

*Troxel* is easily distinguishable from this case because of the differences between the Washington statute and the Illinois statute. As this court indicated in *West*, the Illinois statute is narrowly drawn. In contrast, the Washington statute allowed a petition for visitation to be filed by *any* person at *any* time, provisions that the Supreme Court found "breathtakingly broad." *Troxel*, 530 U.S. at 67, 147 L. Ed. 2d at 57, 120 S. Ct. at 2061. In addition, the Supreme Court recognized that all 50 states had passed grandparental-visitation-rights statutes, and it did not invalidate all of them. The appellant contends, however, that *Troxel* controls for three reasons unrelated to the statutory differences.

First, the appellant contends that *Troxel* mandates that the Illinois statute require a finding of harm to the child before grandparental visitation can be ordered. This is quite simply not the case. In fact, the *Troxel* court specifically avoided that question:

"[W]e do not consider *** whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." *Troxel*, 530 U.S. at 73, 147 L. Ed. 2d at 61, 120 S. Ct. at 2064.

Second, the appellant argues that *Troxel* required a finding of the unfitness of the parents before any court could order grandparental visitation over the parents' objection and that since the Illinois statute does not make parental unfitness a prerequisite for grandparental visitation, it is constitutionally flawed.

The appellant's third contention is that the best-interests-of-the-child requirement is too vague and that since the Illinois statute uses that same standard, it is also unconstitutionally vague.

The appellant's second argument is based on the following language from *Troxel*:

"First, the Troxels did not allege, and no court has found, that Granville was an unfit parent. That aspect of the case is important, for there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68, 147 L. Ed. 2d at 58, 120 S. Ct. at 2061.

There are several problems with the appellant's reliance upon this "fitness" test. First, the *Troxel* ruling was not based solely on this factor. *Troxel* was based on the Court's concern about the broadness of the statute, the fitness presumption, the fact that visitation had not been entirely cut off by the parent, and the fact that the trial court had apparently required the parent to prove that visitation would not be in the children's best interests. It is only after discussing *all* those elements that the Court held as follows:

"[T]he *combination* of these factors demonstrates that the visitation order in this case was an unconstitutional infringement on Granville's fundamental right to make decisions concerning the care, custody, and control of her two daughters." (Emphasis added.) *Troxel*, 530 U.S. at 72, 147 L. Ed. 2d at 60, 120 S. Ct. at 2063.

The second problem with the appellant's reliance on the *Troxel* test is that the test itself is logically flawed. The *Troxel* fitness test is saying:

- All fit parents always make decisions that are in the best interests of their children.
- Granville is a fit parent.
- Therefore, Granville always makes decisions that are in the best interests of her children.

The Supreme Court suggests that in order for grandparents to prevail on visitation petitions, they must first attack the minor premise of the syllogism and establish that the parent is not fit. That, of course, would be one way to proceed, and if it were a successful attack under Illinois law, the grandparents might not only obtain visitation but also custody, since in Illinois unfit parents are subject to having their parental rights terminated (750 ILCS 50/1 (West 2000)).

However, an attack on the minor premise is not the only way to proceed. The problem with the *Troxel* fitness test is that the major premise claims too much; it is simply not true that fit parents always make decisions that are in the best interests of their children. A few examples should be sufficient to dispel the truth of the major premise. Every day, parents who are good and honest and concerned parents do some of the following things. They eat, drink, or smoke too much and, therefore, lessen the likelihood that they will be alive and well throughout their children's lives. On occasion, they drive too fast with children in the car, they allow children to play unsupervised, they fail to save enough for college, they discipline the children too much or too

little, they fail to make it to their son's baseball game or their daughter's soccer game, or they do not help with the homework or they help too much with the homework. Some of these decisions are relatively trivial, but they are all decisions that affect the best interests of the children, and most parents at some time have made some decisions that were not in the best interests of their children.

These mistakes do not mean the parents are unfit; they mean they are human. And just as fit parents can make mistakes in any of the examples given, they can also make mistakes when it comes to decisions about grandparental visitation. To give an example that is not intended to depict the facts in this case, consider the following situation. A young couple marry and have a little girl, but when the child is two years old, they divorce. The mother is awarded custody, and the father has visitation on alternate weekends. It is necessary for the mother to work, and rather than place the baby in a day-care facility, she asks her mother-in-law to care for the child from 8 a.m. to 5:30 p.m. The mother-in-law is not employed outside her home, and she is happy to watch her only grandchild, so she agrees. When the child reaches school age, the mother's employment requires her to work evenings, so the schedule changes. She drops her daughter off at school at 8 a.m., and the grandmother picks the child up at 3 p.m. and keeps her during the evening hours and occasionally overnight. The mother either picks the child up at the end of her shift at midnight or comes by in the morning to pick her up for school. This schedule, although not ideal, is workable and continues to be used for five or six years. The mother is a good and honest and caring woman; the grandmother is the same. They both love the child, and the child loves both of them. Just before the child begins junior high school, things happen. The father dies, and perhaps the mother and her mother-in-law have an argument, or perhaps the mother-in-law feels she is too old to babysit. Whatever the reason and whatever the source of any fault, the mother decides that the grandmother will not be allowed to see the child. Assume, if one has to make such an assumption, that this decision is devastating to the child, who requires significant counseling as a result of her mother's decision. This young girl has spent most of her waking hours not with her parents, but with her grandmother. Her grandmother has been the primary caretaker for her, feeding and clothing her and taking her to or from school, to the doctor, and to most of her childhood functions, for almost her entire life. Is the mother's refusal to allow contact between the child and her grandmother under these hypothetical (and admittedly weighted) circumstances a decision made in the best interests of the child? The appellant contends that *Troxel* would preclude any judicial review of

such a decision because there is no showing of the mother's unfitness as a parent. We disagree and reject the appellant's second *Troxel* contention.

We now turn to the appellant's third *Troxel* argument—that the best-interests-of-the-child standard is so vague as to render the statute unconstitutional. First, based upon our reading of *Troxel*, we note that *Troxel* does not indicate that a concern with the best-interests-of-the-child standard was a major basis of the plurality opinion. Nevertheless, we will address the appellant's concerns about the vagueness of the standard.

First, we note that the best-interests standard is not without statutory definition. Although section 607 of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/607 (West 2000)) itself does not include any defining terms, section 602 of the same act (750 ILCS 5/602 (West 2000)), which deals with the determination of custody, does:

"§ 602. Best Interest of Child.

(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings[,] and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school[,] and community;

(5) the mental and physical health of all individuals involved;

(6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or directed against another person;

(7) the occurrence of ongoing abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986, whether directed against the child or directed against another person; and

(8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.

\* \* \*

(c) Unless the court finds the occurrence of ongoing abuse as defined in Section 103 of the Illinois Domestic Violence Act of 1986, the court shall presume that the maximum involvement and cooperation of both parents regarding the physical, mental, moral, and emotional well-being of their child is in the best interest of the child. There shall be no presumption in favor of or against joint custody." 750 ILCS 5/602 (West 2000).

Thus, courts are not writing upon a blank slate when they make best-interests determinations. We note as an aside that section 602(c) of the Dissolution Act creates a presumption that "the maximum involvement *** of both parents regarding the physical, mental, moral, and emotional well-being of their child is in the best interest of the child." 750 ILCS 5/602(c) (West 2000). This presumption of maximum involvement equaling best interests is a statutory recognition of the importance of extending as much assistance as possible to the children of divorced parents, and it is established not just in connection with a few hours of visitation but also with the determination of the more critical question of the custody of the child. See K. Bartlett, *Rethinking Parenthood as an Exclusive Status: The Need For Legal Alternatives When the Premise of the Nuclear Family Has Failed*, 70 Va. L. Rev. 879 (1984) (the author argues that children may be better served by inclusion rather than exclusion).

Section 602 is not the only source of aid available to trial courts that are faced with making grandparental-visitation decisions. Section 609 of the Dissolution Act (750 ILCS 5/609 (West 2000)) deals with court approval of the removal of children from Illinois, and not surprisingly, the best-interests-of-the-child standard is used for this determination also. Again, we note that the removal of children to another state impacts not just a few hours of visitation time but also the child's location hundreds or even thousands of miles from the original marital home. Although no definitions of best interests are contained in section 609, the Illinois Supreme Court suggested several criteria in *In re Marriage of Eckert*, 119 Ill. 2d 316, 518 N.E.2d 1041 (1988), and these have been utilized in many cases. For example, the supreme court in *In re Marriage of Smith* stated as follows:

"Some factors which a trial court should consider include: (1) the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the children; (2) the motives of the custodial parent in seeking the move; (3) the motives of the noncustodial parent in contesting the move; and (4) the visitation rights of the noncustodial parent." *In re Marriage of Smith*, 172 Ill. 2d 312, 321, 665 N.E.2d 1209, 1213 (1996).

In *Smith*, the court also specifically looked at the following factors:

"(a) whether a reasonable visitation schedule can be reached if the move is allowed; and (b) if removal to a distant jurisdiction will substantially impair the noncustodial parent's involvement with the children, the harm to the children which may result." *Smith*, 172 Ill. 2d at 324, 665 N.E.2d at 1214.

Finally, although the factors contained in it are not specifically directed to the courts' consideration in family cases, section 1—3

(4.05) of the Juvenile Court Act of 1987 contains a veritable laundry list of factors that can be used in determining the best interests of a child:

"(4.05) Whenever a 'best interest' determination is required, the following factors shall be considered in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence[,] which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1—3(4.05) (West 2000).

From this review of the criteria available to assist trial courts in determining best interests, it seems to us that the appellant's concern with that term's supposed vagueness is considerably overstated. This conclusion is strengthened when one is aware that courts have made best-interests-of-the-child decisions in thousands of cases without any significant difficulty in understanding and applying the standard itself. This is not to say the decisions are easy; they are some of the most difficult decisions that a trial judge is called upon to make. But it is the decision, not the standard, that is difficult. We also note again that the decisions made regarding custody, and even removal, will, in most cases, have a great deal more impact on the child than will a decision about a few hours of visitation. Again, this is not to downplay the significance of visitation decisions between members of splintered families who cannot agree on visitation among themselves. But to those

who argue that courts should not be intervening in grandparental-visitation questions, we respond that section 607 does not sanction intervention in intact families, but only in families in which the courts have already been asked to intervene. Parties who ask the courts to dissolve the marital relationship cannot be allowed to maintain that once the courts have been called upon to separate a nuclear family, they should be excluded from limiting the destructive effect of that separation on the children. After all, what is the only area over which family courts refuse to relinquish this authority? Is it not the children? Can not the husband and wife agree to almost any distribution of property, pensions, and maintenance obligations? Indeed they can. But the parties cannot agree, without the court's approval, on the issues of custody, visitation, and support. Trial judges are willing to allow the parties to distribute their property in almost any way they deem fit, but judges are always concerned about the best interests of the children. This concern is exemplified in the line of cases that prohibits divorced parents from agreeing to modifications to the amount of child support due without obtaining the explicit approval of the court that granted the divorce. *E.g., In re Marriage of Pickholtz*, 178 Ill. App. 3d 512, 533 N.E.2d 529 (1988); *In re Marriage of Miller*, 231 Ill. App. 3d 480, 595 N.E.2d 1349 (1992); *Baker v. Baker*, 193 Ill. App. 3d 294, 549 N.E.2d 954 (1990).

These cases are but one example of the general rule that once parents solicit the intervention of the courts to resolve their marital differences, they cannot unilaterally exclude the court from future involvement. The cases are also an example of the rule that courts in family cases are concerned above all else with the best interests of the children. As this case establishes, the court's concern is no longer limited to the custody, visitation, and support questions that must be resolved between disagreeing parents. Section 607 has thrust the courts into the position of resolving visitation issues about grandparents as well. Although this is an additional burden on the courts, it is not an insurmountable one, and as this section hopefully establishes, the best-interests standard is neither a part of the problem nor unconstitutionally vague. In conclusion, we do not agree with the appellant's contention that *Troxel* requires *West v. West*, 294 Ill. App. 3d 356, 689 N.E.2d 1215 (1998), to be overruled.

Turning from the United States Supreme Court's decision in *Troxel* to the Illinois Supreme Court's decision in *Lulay v. Lulay*, 193 Ill. 2d 455, 739 N.E.2d 521 (2000), we note that *Lulay* presents different considerations. First, of course, it deals with the same statute that is involved in this case. Nevertheless, *Lulay* is distinguishable. Three members of the *Lulay* court agreed with the appellant's primary

contention in this case—that section 607(b)(1) of the Dissolution Act (750 ILCS 5/607(b)(1) (West 1998)) is unconstitutional on its face. However, four members of the *Lulay* court did not agree with that contention. The majority holding in *Lulay* is specifically limited to its factual situation, which involved paternal grandparents seeking visitation that was opposed not only by the child's mother but also by their own son. The majority concluded that since section 607(b)(1) allowed grandparents to petition for visitation and to file that claim against their own child, when both parents opposed visitation, the statute was unconstitutional as applied in that case. The majority refused, however, to join the position of the three dissenting justices who called for holding the statute unconstitutional on its face. Instead, the court limited its holding to the facts of that case:

> "Nevertheless, *in this case*, we cannot allow the state to use its power to impose its judgment that visitation may be better for the grandchildren over the *joint decision* of two fit parents who have determined that the visitation should not occur. *The facts of this case* do not warrant the state's interference with the parents' joint decision regarding who may have visitation privileges with their children." (Emphasis added.) *Lulay*, 193 Ill. 2d at 479, 739 N.E.2d at 534.

See also *Langman v. Langman*, 325 Ill. App. 3d 101 (2001) (section 607(b)(1) was unconstitutional *as applied*.)

*Lulay*'s emphasis on the fact that both parents opposed the grandparental visitation and that the grandparents' own son opposed it is significant. Although *Lulay* did not specifically state the reason for its emphasis on the son's opposition to the visitation, other than the obvious one of the parent-child relationship between the grandparents and their son, it may be that the emphasis is also a reflection of most of the statutory bases for grandparental visitation. Section 607(b)(1) lists five bases upon which a petition for visitation may be filed:

> "(A) the parents are not currently cohabiting on a permanent or an indefinite basis;
>
> (B) one of the parents has been absent from the marital abode for more than one month without the spouse knowing his or her whereabouts;
>
> (C) one of the parents is deceased;
>
> (D) one of the parents joins in the petition with the grandparents, great-grandparents, or sibling; or
>
> (E) a sibling is in State custody." 750 ILCS 5/607(b)(1) (West 2000).

Subsection (E) is not relevant to either *Lulay* or this case. However, three of the other four subsections, (A), (B), and (C), all presuppose that the child of the grandparent seeking visitation is completely un-

able to assist them in obtaining visitation or is significantly limited in that regard. For example, under subsection (C) the parent is dead and is clearly unable to assist the grandparents. Under the other two subsections, the parent is, at a minimum, not cohabiting (subsection (A)) or his whereabouts are unknown (subsection (B)). In each of the cases, the parent has either no ability or a very limited ability to act as the grandparents' agent in negotiating for their visitation rights. Might it not be that this negotiation function is what the statute is intended to replace?

To explain: during a functioning marriage, each partner acts as his or her parents' agent in arranging visitation, not only for children but also for the family as a whole. How many times has the following conversation occurred?

> Husband: Are we going to my parents' house for Sunday dinner?
> Wife: I don't think so. We were there the last two times. My mother wants to see the boys.
> Husband: But it's my dad's birthday.
> Wife: That's right. Okay, we'll go to their house on Sunday, but next week we go to my mom's.
> Husband: Okay.

This conversation, or some variation of it, happens thousands of times each week in thousands of homes, but those are homes in which the nuclear family exists as a functioning unit. Under those circumstances, in most cases, each partner within the marriage protects his or her parents' rights to see the grandchildren. What happens when the nuclear family is destroyed? In most cases, the ex-husband or ex-wife continues to act as his or her parents' agents, but when one of the marriage partners disappears or is dead, the grandparents no longer have anyone to assist them. In this case, the grandparents' son is unable to assist them; he is dead, and subsection (C) allows the grandparents to seek visitation on their own. In effect, it protects them from the disappearance of their agent.

The appellant contends that the state has acted unconstitutionally by providing this procedure to grandparents. We agree with *West*—the state has a compelling interest in fostering grandparent-grandchildren relationships. We note that the Illinois Supreme Court had the opportunity to overrule *West*; it cited to it and then limited its *Lulay* ruling to the facts of that case. In view of our agreement with *West*, and *Lulay*'s refusal to change it, we hold that section 607(b)(1) is constitutional.

We now turn from the constitutional challenge to the grandparental-visitation statute to the question of visitation by the paternal grandmother. Although the record in this case is slim, we

note that Julie and Michael Mehring had one child. During the time their divorce was pending, Julie was awarded temporary custody of their five-year-old daughter, Jenna. Michael Mehring died shortly after that decision. On November 26, 1997, Ralph and Ella Mehring brought this action to obtain visitation rights with their granddaughter, Jenna. In April of 1999, Ralph Mehring died; thus, the cause of action as to his interest was dismissed. On April 26, 1999, the court awarded Ella Mehring visitation rights with Jenna.

On May 25, 1999, Julie's attorney filed a motion to reconsider the court's April 26, 1999, decision. No constitutional argument was raised. This motion was denied on June 30, 1999. Julie refused to make the minor child available for visitation, and Ella Mehring filed a motion for contempt. On November 17, 1999, the motion was heard, and Julie was held in willful indirect civil contempt of the court's April 26, 1999, order.

At that November 17 hearing on the contempt citation, Julie filed a motion to declare section 607(b) of the Dissolution Act unconstitutional. The motion was set for a December 15, 1999, hearing. On December 13, 1999, Julie filed a petition to terminate grandparental visitation. On December 21, 1999, after a hearing on the motion to declare the statute unconstitutional, Julie was ordered jailed until such time as she provided seven five-hour visitation periods with Ella. In addition, Julie was ordered to pay Ella's attorney fees of $1,316. The court also modified the sanction for contempt and permitted Julie's release for the Christmas holiday. The court further ruled that section 607(b) is not unconstitutional, citing *West v. West*, 294 Ill. App. 3d 356, 689 N.E.2d 1215 (1998), in support of its decision.

After a hearing on Julie's petition to terminate grandparental visitation, the court denied the petition to terminate. However, it modified its order to provide that, upon Julie's payment of Ella's $1,316 in attorney fees, Julie's confinement at the county jail would be Monday through Friday, from 9 a.m. to 5 p.m.

●3 As previously noted, section 607(b)(1) provides that the court may grant reasonable visitation privileges to a grandparent if the court determines that it is in the best interests and welfare of the child. Julie argues that the trial court did not follow proper procedure at the April 26, 1999, hearing on Ella's petition to establish visitation because no evidence was presented to show that visitation is in Jenna's best interests. We agree. At the hearing on the petition for grandparental visitation, Ella Mehring did not testify, and instead the trial court questioned Julie as to why grandparental visitation should be

denied. In addition, there was no evidence put forth by Ella or any witness on her behalf to show that it was in Jenna's best interests to allow visitation. Under these circumstances, the grandmother did not meet her burden of proof, and we would ordinarily reverse, but Julie did not timely appeal that decision.

The failure to appeal the court's finding that visitation was in Jenna's best interests precludes our consideration of that issue. Since the finding of contempt was based upon Julie's admittedly willful disobedience of the court's unappealed order, we affirm that finding.

●4 Finally, we are asked to consider whether the trial court erred in ordering Julie to pay Ella's attorney fees as a contempt sanction. On November 17, 1999, as part of its contempt sanction, the court ordered Julie to pay Ella's attorney fees. The court ordered Ella's attorney to submit, within seven days, an affidavit showing the fees incurred to enforce the court's order. Ella's attorney did not file an affidavit. Instead, on December 15, 1999, she produced a statement of account, and on January 20, 2000, she testified under oath as to her fees. Julie argues that because Ella's attorney failed to file an affidavit as ordered by the court and instead submitted a statement of account containing matters unrelated to the contempt citation, the court should not have awarded attorney fees.

The trial court's order with respect to attorney fees in postdissolution proceedings will not be disturbed on appeal absent an abuse of discretion. *Posey v. Tate*, 275 Ill. App. 3d 822, 829, 656 N.E.2d 222, 227 (1995). Although Ella's attorney did not submit an affidavit of fees, she did submit a detailed statement of account, about which Julie's attorney subjected Ella's attorney to cross-examination. Having reviewed the record, we do not find that the trial court abused its discretion in ordering Julie to pay, as a sanction for her contempt, Ella's attorney fees of $1,316.

Although we have affirmed the trial court's finding of contempt and assessment of attorney fees against the mother, we want to make it clear that, first, those rulings are the result of the mother's failure to appeal the original visitation order and, second, that the burden of proof in these cases is upon the grandparent seeking visitation. If there is a further challenge to the visitation schedule by the mother based upon any change in circumstances, the trial court should be aware that this court's ruling does not in any way alter the burden of proof.

In conclusion, we deny the appellant's challenge to the constitutionality of section 607(b)(1) on its face, and we affirm the trial court's

finding of contempt. We also affirm the trial court's assessment of attorney fees.

Affirmed.

WELCH, J., concurs.

JUSTICE GOLDENHERSH, specially concurring:

I concur in the result reached by my colleagues in the majority opinion. However, I have two points of disagreement.

The first part of the majority's opinion analogizes litigation in the family area, such as that of the instant case, to a form of warfare. Unfortunately, such comparisons foster an image of unprincipled, unlimited, and bitter combat as the norm in family matters. While such litigation does, in fact, occur at times, the responsible practitioner will counsel litigants to put the interests of their children ahead of their own emotions, desires, and feelings of anger and hurt. Likewise, a responsible judge faced with one of these heart-rendering decisions will separate the consideration of the best interests of the children from a bitter clash of the parents. Most important, responsible parents who are guided by responsible counseling by our domestic relations bar will make responsible decisions in the best interests of their children, putting aside any feelings of hurt, anger, or passion for revenge. The worst possible fate for minor children caught in the maelstrom of a custody or visitation fight is to be used as pawns in a litigation game or to be used as swords to injure the opposing party. The analogy to warfare in this context is contrary to the best interests of children.

My second point of contention with the majority opinion focuses on what I believe is a misreading of *Troxel v. Granville*, 530 U.S. 57, 147 L. Ed. 2d 49, 120 S. Ct. 2054 (2000). *Troxel* is an important case with immense repercussions in the domestic relations area (see *Lulay v. Lulay*, 193 Ill. 2d 455, 739 N.E.2d 521 (2000)). The majority analyzes *Troxel* correctly in noting that it does not require that a court make a finding of harm before it grants grandparental visitation and similarly does not require that a court make a finding of unfitness before it orders such visitation over parental objections. I disagree with the majority, however, in its distillation of the basis of *Troxel* into an inaccurate syllogism.

The majority poses the fitness test in *Troxel* as follows:

"• All fit parents always make decisions that are in the best interests of their children.

• Granville is a fit parent.

• Therefore, Granville always makes decisions that are in the best interests of her children.

\*\*\*

\*\*\* The problem with the *Troxel* fitness test is that the major premise claims too much; it is simply not true that fit parents always make decisions that are in the best interests of their children." 324 Ill. App. 3d at 267.
The majority then proceeds to delineate examples.

This is not what *Troxel* says. As noted in the majority's own earlier quotations from *Troxel*, the Supreme Court posed the fitness of parents as a presumption and not a given. The majority quotes *Troxel* as saying, " '[T]here is a presumption that fit parents act in the best interests of their children' " (324 Ill. App. 3d at 267, quoting *Troxel*, 530 U.S. at 68, 147 L. Ed. 2d at 58, 120 S. Ct. at 2061), and further notes that *Troxel* was based on, among other things, "the fitness presumption" (324 Ill. App. 3d at 267). The Supreme Court in *Troxel* stated, "[T]he interest of parents in the care, custody, and control of their children[ ] is perhaps the oldest of the fundamental liberty interests recognized by this Court" (530 U.S. at 65, 147 L. Ed. 2d at 56, 120 S. Ct. at 2060), and the *Troxel* Court also stated, as quoted by the majority, that there is a *presumption* that fit parents act in the best interests of their children (324 Ill. App. 3d at 267; *Troxel*, 530 U.S. at 68, 147 L. Ed. 2d at 58, 120 S. Ct. at 2061). The Supreme Court later assessed the fundamental flaw in the superior court's order:

> "The decisional framework employed by the Superior Court directly contravened the traditional *presumption* that a fit parent will act in the best interest of his or her child. [Citation.] In that respect, the court's *presumption* failed to provide any protection for Granville's fundamental constitutional right to make decisions concerning the rearing of her own daughters." (Emphasis added.) *Troxel*, 530 U.S. at 69-70, 147 L. Ed. 2d at 59, 120 S. Ct. at 2062.

The *Troxel* Court clearly posed the major premise of its syllogism not as the majority states ("All fit parents always make decisions that are in the best interests of their children") but in terms of a presumption. The Illinois Supreme Court similarly interpreted *Troxel* in *Lulay*:

> "Next, looking at the facts of [*Troxel*], the Court noted that the grandparents did not allege, and no court has found, that the mother was an unfit parent. This point is pivotal because a court must *presume* that fit parents act in the best interests of their children." (Emphasis added.) *Lulay*, 193 Ill. 2d at 462, 739 N.E.2d at 525, citing *Troxel*, 530 U.S. at 68, 147 L. Ed. 2d at 58, 120 S. Ct. at 2061.

This is a distinction with a difference, because this presumption by its very nature is rebuttable and in the context of visitation litigation is a point that is more likely to be litigated than the general fit-

ness or unfitness of the custodial parent; it puts at issue a best-interests analysis of a decision denying visitation, as opposed to the much more problematic question of the fitness of a particular parent. So that the inevitable litigation similar to the instant case may be appropriately conducted and resolved, it is important that the components and the implications of the *Troxel* decision are adequately and fully stated.