2002-NMCA-074

50 P.3d 194

**Leslie A. WILLIAMS & Sandra D. Williams, Grandparents, Petitioners–Appellees,**

v.

**Michael Leslie WILLIAMS, Sr., Respondent–Appellant,**

and

**Luann St. Onge, Respondent in Intervention–Appellant.**

No. 22,349.

Court of Appeals of New Mexico.

May 31, 2002.

Joseph P. Kennedy, Albuquerque, NM, for Appellants.

. W.H. (Hal) Greig, Greig & Richards, P.A., Clovis, NM, for Appellees.

## OPINION

BOSSON, Chief Judge.

{1} Parents of a minor child appeal a district court order granting visitation rights to the paternal grandparents over the parents' objection. *See* Grandparent's Visitation Privileges Act ("GVA"), NMSA 1978, § 40–9–1 to—4 (1993, as amended through 1999). On appeal, the parents rely extensively on the recent opinion of the United States Supreme Court in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), which affords us our first opportunity to consider that opinion in light of New Mexico law. We conclude that the district court acted in a manner consistent with *Troxel,* and therefore we affirm.

## BACKGROUND

{2} The minor child ("Child") was born in New Hampshire in 1989. Child's father ("Father") and mother ("Mother") (collectively "Parents") divorced in 1990. While Mother remained in New Hampshire, Father took Child to live with his parents ("Grandparents") in Clovis, New Mexico. Thereafter, Father and Child resided in Grandparents' home until the end of January 2000, except for a period of approximately three years, when Father and Child lived in Phoenix, Arizona. As a result, Grandparents have provided care and support to Child throughout the majority of Child's life.

{3} Mother had little contact with Child prior to this action. She visited Child only two or three times in ten years, keeping in contact with Child primarily through occasional phone calls and correspondence. Mother has subsequently become more involved in Child's life.

{4} The relationship between Father and Grandparents began to deteriorate around the time that Father remarried in January 2000. Shortly after Father's remarriage, Father and Child left Grandparents' residence and moved in with Father's new wife ("Wife") and three of her children. Father and Wife disagreed with Grandparents on various issues related to Child's upbringing and, consequently, began to curtail Child's contact with Grandparents. In response, Grandparents petitioned for court-ordered visitation privileges pursuant to the GVA. Mother was not initially made a party to this action.

{5} After a hearing in May 2000, the district court granted Grandparents' request for visitation with Child. Shortly thereafter, Father and Wife moved, with Child, from New Mexico to Atlanta, Georgia. Because Father would not disclose Child's whereabouts, Grandparents hired a private investigator to locate Father and Child. Upon Grandparents' motion, the district court found Father in contempt of court for his violation of the court's visitation order. A bench warrant issued for Father, who was arrested, extradited to New Mexico, and incarcerated for approximately thirty days, until the district court suspended the contempt sentence to permit Father's release.

{6} During Father's incarceration, Mother moved to intervene in the action, and both Father and Mother sought to strike the court's previous visitation order. Mother also contended that the visitation order was void for lack of notice to her. The court denied the motions, but granted a supplemental hearing to consider Mother's testimony and to consider any changed circumstances since the previous hearing.

{7} Following a hearing, at which Mother testified telephonically, the district court issued a new order on April 27, 2001, in which it, again, granted visitation privileges to Grandparents. Because Child was then residing in Georgia, the court designated Texarkana, Texas, located approximately halfway between Atlanta and Clovis, as the exchange location for visitation purposes. Father was ordered to transport Child to and from Texarkana for scheduled exchanges every other month, and Grandparents were ordered to reimburse Father for mileage and lodging. Despite the court order, Father failed to bring Child to Texarkana in May of 2001 for a scheduled exchange. Shortly thereafter, Father and Mother filed this appeal challenging Grandparents' right to court-ordered visitation.

## DISCUSSION

{8} Father and Mother argue that the district court violated their rights, under

the federal constitution, by (1) failing to give special consideration to their wishes that Child not see Grandparents, and (2) ordering grandparent visitation, despite their opposition, where there was no finding of parental unfitness. Absent a finding of unfitness, Parents argue that the court was constitutionally required to defer to their opinion under the facts of this case. Father and Mother rely heavily on *Troxel*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (reversing grandparent visitation that was awarded under Washington's non-parent visitation statute against the wishes of the parent). This appeal raises questions of law, which we review de novo. *See Gabaldon v. Erisa Mortgage Co.*, 1999–NMSC–039, ¶ 7, 128 N.M. 84, 990 P.2d 197.

*Grandparent's Visitation Privileges Act of New Mexico*

{9} The GVA allows grandparents to petition the court for visitation under a limited number of specific circumstances, such as divorce, the death of a parent, or termination of parental rights. *See* § 40–9–2. The petition in this case was filed pursuant to Section 40–9–2(D) of the GVA, which authorizes grandparent visitation when a minor child has resided with the grandparents for at least six months after the age of six, and the child is subsequently removed from the grandparents' home. When considering a petition for visitation privileges, the statute requires a court to consider the following factors:

(1) any factors relevant to the best interests of the child;

(2) the prior interaction between the grandparent and the child;

(3) the prior interaction between the grandparent and each parent of the child;

(4) the present relationship between the grandparent and each parent of the child;

(5) time-sharing or visitation arrangements that were in place prior to filing of the petition;

(6) the effect the visitation with the grandparent will have on the child;

(7) if the grandparent has any prior convictions for physical, emotional or sexual abuse or neglect; and

(8) if the grandparent has previously been a full-time caretaker for the child for a significant period.

Section 40–9–2(G). In addition to these statutory factors, this Court has identified other, relevant factors which a court may consider in applying the GVA:

(1) the love, affection, and other emotional ties which may exist between the grandparent and child; (2) the nature and quality of the grandparent-child relationship and the length of time it has existed; (3) whether visitation will promote or disrupt the child's development; (4) the physical, emotional, mental, and social needs of the child; (5) *the wishes and opinion of the parents;* and (6) the willingness and ability of the grandparent to facilitate and encourage a close relationship among the parent and the child.

*Lucero v. Hart*, 120 N.M. 794, 800, 907 P.2d 198, 204 (Ct.App.1995) (reversing an award of grandparent visitation rights not shown to be in the best interests of the child) (emphasis added).

{10} Parents' appeal takes a narrow focus. Significantly, Father and Mother do not challenge the details of the court's visitation plan. For instance, they do not argue that the court abused its discretion by compelling Father to travel hundreds of miles from Georgia to Texas, several times a year, to accommodate Grandparents' visitation. Nor do Father and Mother argue that *Troxel* makes the GVA unconstitutional on its face. They challenge only the application of the GVA, to this case, in light of *Troxel.* Specifically, Parents contend that Grandparents failed to lay an adequate foundation, under *Troxel,* for the court to order visitation against their will. To answer that question, we must examine in some detail the Supreme Court's opinion in *Troxel.*

*Troxel v. Granville*

{11} In *Troxel*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49, Washington's non-parental visitation statute had been found unconstitutional by the Washington Supreme Court.

In a plurality opinion,[1] the United States Supreme Court held that the Washington statute, as applied by the Washington court to the facts before it, "was an unconstitutional infringement on [the mother's] fundamental right to make decisions concerning the care, custody, and control of her two daughters." *Id.* at 72, 120 S.Ct. 2054; *see also Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (describing fundamental liberty interest of natural parents in the upbringing of their children); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (same); *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (same). The Supreme Court did not, however, define the scope of parental due process rights in the visitation context, nor did it address the constitutionality of non-parental visitation statutes in general. *Troxel*, 530 U.S. at 73, 120 S.Ct. 2054.

{12} The *Troxel* plurality based its conclusion on a combination of factors. *See id.* at 68–73, 120 S.Ct. 2054. Overtly, the Court's decision rested on the "sweeping breadth" of the Washington statute, which allowed "any person" to petition for visitation, "at any time," and authorized the court to grant visitation rights whenever "visitation may serve the best interest of the child." *Id.* at 67, 73, 120 S.Ct. 2054 (emphasis and citation omitted); *cf.* § 40–9–2. Thus, the Court was deeply troubled by the seemingly unfettered authority of the Washington court to substitute its own view for that of the parents with regard to the best interests of the child. *See Troxel*, 530 U.S. at 67–68, 71, 120 S.Ct. 2054.

{13} The Court emphasized that the mother in *Troxel*, 530 U.S. at 71, 120 S.Ct. 2054, had not flatly opposed all grandparent visitation, but had only sought to place reasonable limitations on the degree and timing of visitation. Essentially, the trial judge simply differed with the mother's assessment of what amount of visitation would be in the best interests of her children. *Id.* at 67–68, 71, 120 S.Ct. 2054. The Supreme Court also expressed concern that the trial court had given "no special weight at all" to the mother's determination of her children's best in-terests. *Id.* at 69, 120 S.Ct. 2054. To the contrary, the trial court had applied the opposite presumption and had, in effect, placed on the mother the burden of *disproving* that grandparent visitation was in her children's best interests. *Id.* Finally, the Supreme Court was troubled that the mother's decision had been overruled without any finding, or even an allegation, of parental unfitness to decide, on her own, the best interests of her children. *Id.* at 68, 120 S.Ct. 2054.

{14} Considering these factors together, the Supreme Court concluded that the Washington visitation order was an unconstitutional infringement on the mother's fundamental right to make decisions concerning the upbringing of her children. *Id.* at 72, 120 S.Ct. 2054. The visitation order lacked the kind of special circumstances that are constitutionally necessary to justify state interference in a parent's right to determine the best interests of his or her child. *Id.* at 68, 72, 120 S.Ct. 2054. *See generally* David D. Meyer, *Who Gets the Children? Parental Rights after Troxel v. Granville: Constitutional Pragmatism for a Changing American Family*, 32 Rutgers L.J. 711, 714 (2001) (asserting that a majority of the Court embraces "what might be called a constitutional rule of reasonable deference"; that although parents are presumed to act in the best interests of their children, "this presumption can be rebutted by unusual family circumstances") ("David D. Meyer").

### Special Weight Given to Parent's Wishes

{15} Father and Mother argue that, like the Washington court in *Troxel*, the district court failed to give special weight to their wishes opposing grandparent visitation. *See Troxel*, 530 U.S. at 70, 120 S.Ct. 2054 (noting that a trial court "must accord at least some special weight" to the wishes of a fit parent in the visitation context). However, after carefully comparing Parents' case to *Troxel*, we disagree. We conclude that, under the circumstances, the district court afforded sufficient consideration and weight to Parents' wishes in the course of determining the best interests of Child.

---

1. Justice O'Connor was joined by Chief Justice Rehnquist and Justices Ginsburg and Breyer in her plurality opinion, with Justices Souter and Thomas concurring in the judgment.

{16} *Troxel* did not, as Parents argue, establish a bright-line test for the consideration of parental rights in the visitation context; rather, the Court reached its judgment through a fact-specific analysis. The facts in *Troxel* were different, in a number of important respects, from the case before us. For example, in *Troxel*, 530 U.S. at 69, 120 S.Ct. 2054, the Washington court failed to give any special weight to the mother's wishes and essentially shifted the burden of persuasion from the grandparents to the mother regarding the best interests of her children. Significantly, in the present case, Father and Mother do not argue that the district court placed an unfair burden of persuasion upon them, nor do we find any such evidence in the record. Grandparents at all times carried the burden of persuading the court to overturn the wishes of Parents with respect to visitation.

{17} Unlike the mother in *Troxel*, who was only trying to impose reasonable limits on visitation, Father and Mother flatly opposed any visitation with Grandparents. *Cf. id.* at 71, 120 S.Ct. 2054 (stating that mother sought only to limit visitation); *see also Woodruff v. Klein*, 762 N.E.2d 223, 228 (Ind. Ct.App.2002) (affirming denial of grandparent visitation where father *was allowing some visitation* between child and grandparents); *Brice v. Brice*, 133 Md.App. 302, 754 A.2d 1132, 1136 (Ct.Spec.App.2000) (reversing court-ordered visitation where there was no showing that mother refused visitation entirely and there was no showing that mother was unfit). The reasonableness of a parent's opposition is one of the factors a court may assess in deciding what weight to accord that position.

{18} Furthermore, the Supreme Court in *Troxel*, 530 U.S. at 72, 120 S.Ct. 2054, emphasized the paucity of judicial findings in support of its visitation order. The Washington court found only that the grandparents were part of a large, loving family that could "provide opportunities for the children in the areas of cousins and music," and that "[t]he children would be benefitted from spending quality time with [them]." *Id.* (internal quotation marks and citation omitted). The Supreme Court concluded that

[t]hese slender findings, in combination with the [state] court's announced presumption in favor of grandparent visitation and its failure to accord significant weight to [the mother's] already having offered meaningful visitation to the [grandparents], show that this case involves nothing more than a simple disagreement between the Washington Superior Court and [the mother] concerning her children's best interests.

*Id.*

{19} In the case before us, the district court made a number of specific findings in support of the visitation order that have not been challenged on appeal. For example, the court found that Grandparents had provided primary care for the majority of Child's life. The court found that Grandparents "stood in the role and relationship of *loco parentis* [.]" Significantly, Grandparents established this meaningful relationship with Child through Father's participation and consent.

{20} The GVA authorizes the district court to place appropriate weight on Grandparents' *in loco parentis* status. *See* § 40-9-2(C) & (D) (allowing grandparents to petition for visitation where a child resided with the grandparent for a requisite amount of time). This is in line with decisions from other jurisdictions considering *Troxel*. *See Kinnard v. Kinnard*, 43 P.3d 150, 155 (Alaska 2002) (distinguishing *Troxel* and affirming award of shared custody to stepmother, over objections of father, where stepmother had been in the role of psychological parent, such that continuing contact would be in child's best interests); *Rideout v. Riendeau*, 761 A.2d 291, 301 (Me.2000) (holding that grandparent visitation order did not violate constitutional rights of parents where grandparents had acted as parents for significant periods of time).

{21} Even with Grandparents' *in loco parentis* status, the district court did not ignore the wishes of the Parents. To the contrary, the court, in its own words, "made every effort and accommodation to recognize the parental status of [Father]." For example, the court ordered Grandparents, during visitation with Child, to comply with Father's

restrictions regarding medication, religious activities, and psychological or mental health evaluations for Child. *See Lucero,* 120 N.M. at 800, 907 P.2d at 204 (specifically including the wishes of the parents in the factors to be considered in granting or denying grandparent visitation). Importantly, the court deferred to Father's wishes notwithstanding the court's "specific significant concerns" related to Father's ability to parent.

{22} With regard to Mother's wishes, she did not testify as to her own specific objections to grandparent visitation. She said only that she opposed visitation because she trusted Father's judgment regarding his parents. Mother, who was still living in New Hampshire, but had seen Child somewhat more frequently since the family moved to Georgia, appeared from her testimony to be concerned only that Grandparent visitation not interfere with her visits with Child. However, Grandparents testified that they were willing to work around Mother's schedule in planning their visits with Child, so as not to interfere with Child's developing relationship with his Mother. Furthermore, the court properly considered the fact that Mother had "no relationship with the minor child, of any significance," until the Summer of 2000.

{23} We agree with Parents that, as a general proposition, *Troxel* does require courts to give special consideration to the wishes of parents, and appropriately so. However, we do not read *Troxel* as giving parents the ultimate veto on visitation in every instance. *Troxel* may have altered, but it did not eradicate, the kind of balancing process that normally occurs in visitation decisions. *Compare* Terra L. Henry Sapp, *Privacy Grandparent Visitation Statutes in the Aftermath of Troxel v. Granville,* 17 J. Am. Acad. Matrimonial Law. 121, 122–23 (2001) (arguing that, although the "law is still in flux," *Troxel* "places a higher burden of proof on third parties seeking visitation"), *with* David D. Meyer, *supra,* at 711–12 (asserting that *Troxel* may actually limit, rather than expand, parents' rights because the Supreme Court did not use strict scrutiny, but favored a "more meandering inquiry that balances traditional respect for parental prerogative

against the emerging demands of non-traditional caregiving relationships ... deepen[ing] the distinction between family privacy and other fundamental constitutional rights").

{24} Under the circumstances of this case, we conclude that the district court gave appropriate weight to the wishes of Parents and did its best to accommodate those wishes in fashioning its visitation order. *Cf. Troxel,* 530 U.S. at 68, 72, 120 S.Ct. 2054; *see also Ridenour v. Ridenour,* 120 N.M. 352, 354–55, 901 P.2d 770, 772–73 (Ct.App.1995) (acknowledging that parents' rights to raise their children is not beyond regulation and accommodates and balances the best interests of the children, as well as the interests of the state and the grandparents). The decision to award visitation privileges to Grandparents finds specific support in the record of a kind notably absent from the opinion in *Troxel.* That support includes the documented need to nurture the prior relationship between Child and Grandparents and the "significant concerns" expressed by the court regarding Father's ability to be a good parent. Unlike *Troxel,* we do not believe this case "involves nothing more than a simple disagreement between the [district court] and [Father] concerning [his child's] best interests." *Troxel,* 530 U.S. at 72, 120 S.Ct. 2054.

*Parental Fitness*

{25} Father and Mother also argue that, as a matter of law, the district court could not grant Grandparents visitation unless it found Father and Mother unfit as parents. In other words, absent a finding of parental unfitness, Father and Mother argue that, under *Troxel,* the parents' wishes must prevail. We conclude that Parents' reliance on *Troxel* for this proposition is misplaced.

{26} The *Troxel* plurality determined that the Washington court had erred by failing to give special weight to the wishes of the mother when, among other factors, "the [grandparents] did not allege, and no court has found, that [the mother] was an unfit parent." *Id.* at 68, 120 S.Ct. 2054. The Supreme Court stated that "so long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for

the State to inject itself into the private realm of the family." *Id.* The Court emphasized that the Washington court order "was not founded on any special factors that might justify the State's interference with [the mother's] fundamental right to make decisions concerning the rearing of her two daughters." *Id.*

■ {27} However, we do not read *Troxel* as requiring a formal finding of parental unfitness before a court can order grandparent visitation. Rather, we interpret *Troxel* as requiring the presence of "special factors" before a court can order grandparent visitation over the objections of a fit parent. *See Troxel,* 530 U.S. at 68. This is consistent with other jurisdictions that have considered the question. *See, e.g., In re Marriage of Mehring,* 324 Ill.App.3d 262, 258 Ill.Dec. 28, 755 N.E.2d 109, 112–14 (2001) (construing *Troxel* as having reached its conclusion based on a combination of factors and rejecting the argument that *Troxel* categorically requires a finding of unfitness before a court may order visitation against the wishes of parents). Those "special factors" may include the court's concerns, founded in the record, regarding the ability of the parent to carry out his or her responsibilities in an appropriate manner. *See Troxel,* 530 U.S. at 68, 120 S.Ct. 2054. However, those concerns need not rise to the level of a judicial finding of parental unfitness. We reject Father's and Mother's argument to the contrary.

■ {28} Special factors regarding parental unfitness supported the court's order in this case. The court found that Mother had no significant relationship with Child prior to the Summer of 2000. Notably, the court's findings state that "the Court would have had specific significant concerns as to the parental fitness of [Father] in light of the testimony which has been presented." Those concerns are rooted in the evidence, and include specific references to the family environment in Father's household, including issues with Wife's children, and the potential impact upon Child's welfare. In particular, there was evidence of drug and alcohol use and abuse, violence, anger-management issues, and troubles with the law in Father's household that the court reasonably could

have relied upon in noting its "specific significant concerns." We are satisfied that the district court properly considered parental fitness in the overall calculus of grandparent visitation.

{29} In short, Grandparents presented a case in support of visitation that differed markedly from the facts in *Troxel.* The court had far more basis in the record to interfere, on Grandparents' behalf, than did the Washington court in *Troxel.* Contrary to *Troxel,* this is not an instance of a court merely substituting its own vision of the best interests of a child for that of a parent.

*Notice to Mother*

{30} On appeal, Mother argues that the district court erred by failing to strike the court's June 2000 visitation order, because she was not given notice of those earlier proceedings and because the court relied on those earlier proceeding in its final order of April 27, 2001. Grandparents moved to join Mother in August 2000, although Father initially objected to Mother's involvement in the matter. Mother intervened in September 2000, while Father was incarcerated for refusing to comply with the court's initial visitation order. Mother's motion to intervene asked the court to strike the June 2000 order for failing to notify an indispensable party. The district court denied the motion to strike and, instead, scheduled an additional hearing, affording Mother the opportunity to litigate the issue.

■ {31} We review the district court's denial of Mother's motion for an abuse of discretion. *See Rivera v. Trujillo,* 1999–NMCA–129, ¶ 16, 128 N.M. 106, 990 P.2d 219. "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims,* 1996–NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153.

■ {32} Although the court refused to strike the earlier proceedings, its order explicitly provided Mother an opportunity to subpoena and cross-examine any of the witnesses who testified at the earlier hearing. Additionally, Mother was invited to present "such additional evidence or argument as she

deems appropriate." Mother testified briefly, by telephone, at the final hearing in April 2001, but did not exercise her option to cross-examine any witnesses or to present other evidence.

{33} Mother argues that the district court was required to begin the proceedings anew, so that she could be included in the entire process. Mother fails, however, to develop or provide adequate authority for an argument in support of this position. More importantly, Mother does not explain how she was prejudiced by the district court's denial of her motion, or how her earlier involvement might have changed the result. *See Reichert v. Atler,* 117 N.M. 628, 630, 875 P.2d 384, 386 (Ct.App.1992) (because the failure to join an indispensable party is no longer considered a jurisdictional defect, such a claim will only prevail where there has been prejudice to the party not joined), *aff'd,* 117 N.M. 623, 875 P.2d 379 (1994); *In re Estate of Heeter,* 113 N.M. 691, 695, 831 P.2d 990, 994 (Ct.App. 1992) ("On appeal, error will not be corrected if it will not change the result.").

{34} The district court made reasonable efforts to include Mother in the process, once her concerns surfaced. The court did not have to start from scratch; it could make reasonable accommodations for Mother and her issues, while continuing to move the case forward. The court did not abuse its discretion.

## CONCLUSION

{35} For the foregoing reasons, we affirm the judgment of the district court.

{36} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and LYNN PICKARD, Judges.