**In the Interest of E.L.M.C., a Child,**

**and**

**Concerning Cheryl Ann Clark, Appellant,**

**and**

**Elsey Maxwell McLeod, Appellee.**

**No. 03CA1121.**

Colorado Court of Appeals,
Div. V.

July 1, 2004.

Certiorari Denied Oct. 25, 2004.*

---

** Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2003.

* Justice BENDER and Justice RICE do not participate.

Justice COATS would grant as to the following issues:

If the court of appeals' discussion of psychological parenthood was consistent with section 14-10-123, 8 C.R.S. (2004).

If the court of appeals properly articulated the standard for psychological parenthood in light of section 14-10-123, whether section 14-10-123 violates the Fourteenth Amendment as applied to this case in light of *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

Whether risk of emotional harm that would be caused by the loss of a psychological parent is a "special factor" under *Troxel*.

Rouse & Associates, PC, James P. Rouse, Amy D. Desai, Greenwood Village, Colorado, for Appellant.

Mills and Weitzenkorn, PC, Gina B. Weitzenkorn, Denver, Colorado, for Appellee.

Peterson, Dymond, & Reagor, LLP, David D. Schlachter, Englewood, Colorado; Mathew D. Staver, Longwood, Florida, for Amicus Curiae Liberty Counsel.

Brett B. Harvey, Scottsdale, Arizona; Langdon & Shafer, LLC, Jeffrey A. Shafer, Cincinnati, Ohio, for Amicus Curiae Rocky Mountain Family Council.

Hoffman, Reilley, Pozner & Williamson, Kyle C. Velte, Denver, Colorado; Michael E. Brewer, Denver, Colorado, for Amicus Curiae Center's Legal Initiatives Project.

Willoughby Law Firm, LLC, Kimberly R. Willoughby, Denver, Colorado; Shannon Minter, Courtney Joslin, San Francisco, California, for Amicus Curiae National Center for Lesbian Rights.

Heather R. Hanneman, Denver, Colorado; Mark Silverstein, Denver, Colorado, for Amicus Curiae American Civil Liberties Union.

Opinion by Judge WEBB.

In this proceeding concerning statutory allocation of parental responsibilities for E.L.M.C., a minor child, Cheryl Ann Clark, the child's adoptive mother, appeals the trial court's order awarding joint parental responsibilities, except for religion and dental care, to Elsey Maxwell McLeod, Clark's former domestic partner. Clark also appeals the order's prohibition against her exposing E.L.M.C. to "religious upbringing or teaching ... that can be considered homophobic."

This case illustrates the evolving nature of parenthood. *See N.A.H. v. S.L.S.,* 9 P.3d 354, 359 (Colo.2000)("Parenthood in our complex society comprises much more than biological ties, and litigants increasingly are asking courts to address issues that involve delicate balances between traditional expectations and current realities."); *see also Troxel v. Granville,* 530 U.S. 57, 63, 120 S.Ct. 2054, 2059, 147 L.Ed.2d 49 (2000)("The demographic changes of the past century make it difficult to speak of an average American family.").

Clark relies primarily on *Troxel, supra.* There, the Supreme Court held a state grandparent visitation statute unconstitutional, as applied, because the order for grandparent visitation unjustifiably interfered with the natural mother's due process right to make decisions concerning the care, custody, and control of her children.

Hence, we consider whether here, in light of *Troxel,* the trial court's award of joint parental responsibilities to McLeod, neither a natural nor an adoptive parent, under §§ 14–10–123, 14–10–123.4, and 14–10–124(1.5), C.R.S.2003, unconstitutionally interferes with Clark's fundamental right as the fit, legal parent to make decisions regarding E.L.M.C. We affirm the trial court's parental responsibilities allocation on the basis that McLeod

had become E.L.M.C.'s psychological parent, E.L.M.C.'s continuous recognition of McLeod as a parent almost from birth, E.L.M.C.'s age—nine years when the trial court entered permanent orders—and the risk of emotional harm to her inherent in Clark's parenting plan, which curtailed and then terminated McLeod's court-ordered parenting time. Whether a child's best interests could justify subordinating a legal parent's constitutional rights to the claim of a nonparent seeking parental responsibilities, without the threat of emotional harm, is a question we leave for another day.

We also consider whether the prohibition against homophobic religious teachings impermissibly invades Clark's rights to control the religious upbringing of E.L.M.C. under the Free Exercise Clause of the First Amendment to the United States Constitution and its Colorado counterpart. We vacate the order as to this limitation and remand this aspect of the case to the trial court for findings required by § 14–10–130(1), C.R.S.2003, which are also necessary to resolve the First Amendment issue.

### Table of Contents

I. Facts

II. Legal Framework

 A. *In re Custody of C.C.R.S.*

 B. Troxel v. Granville

 C. Level of Scrutiny

III. Jurisdiction

 A. Legal Relationship

 B. Incident to Dissolution Proceedings

 C. Exclusive Physical Care

 D. Petition Within Six Months

IV. Allocation of Parental Responsibilities

 A. Federal Constitutional Considerations

 B. Parental Unfitness and Harm

 C. The Psychological Parent Doctrine and Harm

 D. Trial Court Findings and Record

V. Religious Upbringing

(This Table of Contents and the section headings throughout this opinion are offered solely for the convenience of the reader and do not control or modify the substance of each section.)

### I. Facts

The trial court found, with record support, the following facts. Clark and McLeod lived in a committed relationship for eleven years before this action; they owned a home in joint tenancy, had a commitment ceremony, and discussed having a child through in vitro fertilization or by adoption. In 1994, Clark began the process of applying for the adoption of a child from China.

The social worker who performed the background check for the adoption indicated China would not permit an adoption by a same-sex couple. For this reason, the adoption papers were made out in the name of Clark alone. However, Clark and McLeod traveled to China together, where Clark adopted E.L.M.C., who was then about six months old.

Shortly thereafter, Colorado recognized Clark's adoption of E.L.M.C. Clark and McLeod sent an "arrival announcement" to friends:

> [E.L.M.C.] was born in the Hunan providence of the People's Republic of China. She lived the first six months of her life in the Yue Yang Children's Welfare Home in Yue Yang, China. She now lives with two adoring moms. [McLeod] and [Clark] live in Denver, Colorado.

The couple filed a joint "Petition for Custody" under § 14–10–123 with Clark as a parent and McLeod as a nonparent in 1996. The petition for custody stated:

> Co–Petitioners have lived together for the past six and one-half years as a couple. They had a commitment ceremony on July 31, 1993. They carefully discussed having a family together. Clark's plans to adopt [E.L.M.C.] included an intention to have [E.L.M.C.] raised by Clark and McLeod as one family with two parents.

The joint trial brief submitted in support of the petition for custody stated, in pertinent part:

[E.L.M.C.] considers each of the Co–Petitioners to be a parent; she refers to McLeod as "mommy" and Clark as "momma." She looks to both Co–Petitioners for love, affection and nurturance. Co–Petitioners have shared the financial cost of supporting [E.L.M.C.] and they share all major decisions involving [E.L.M.C.'s] life, including provisions of daycare during the times that Co–Petitioners must both work.

The district court awarded joint custody of E.L.M.C. to Clark and McLeod. Neither party appealed.

Clark also petitioned to change the child's name to include McLeod's name "to acknowledge an important family member instrumental to [the child's] adoption from China." Clark signed the pediatrician's information sheet that identified McLeod as a "mother." Both women were listed as mothers of the child in the school directory.

The child's nanny testified that both Clark and McLeod interviewed her for the job and that, during her approximately two and one-half years of caring for E.L.M.C., she observed that they were equally parenting the child.

When the relationship between Clark and McLeod began to fail, approximately five years after the joint custody award and six years after the adoption, Clark sent a letter to McLeod, stating, in relevant part:

> As I review the last two and one-half years since we adopted [E.L.M.C.], I see several areas that plague and distress me. First of all, shortly after we got back from China we started to talk about ways to protect your legal relationship with [E.L.M.C.]. This was important to both of us and we pursued and accomplished that the best we can in Colorado ... we changed [E.L.M.C.'s] name to include yours. I changed my will before we left to designate you as her guardian should anything happen to me, and we pursued joint custody. All these actions work towards protecting your family integrity and specifically your relationship, legally, with [E.L.M.C.]....
>
> You attached to [E.L.M.C.] so strongly that I felt that I could not get in; that you would not let me in as you bonded to [her].

> I have watched this attachment to her from the beginning and while much of it is wonderful ... I also feel that you leave me out and had not really responded to my several requests to help me with that.

Thus, although Clark was the only legal parent, the record supports the trial court's conclusion that it was "abundantly clear" both women intended to, and did, coparent E.L.M.C.

In 2001, after the parties' relationship ended and a dispute over parenting time arose, Clark sought to restrict McLeod to ten overnights per month in 2003 and six overnights per month in 2004, and to terminate all court-ordered parenting time in 2005. McLeod petitioned for roughly equal parenting time.

Clark filed a motion for temporary orders and challenged the validity of the 1996 joint custody order. A magistrate declared the joint custody order void on the basis that the district court lacked jurisdiction because no controversy existed between the parties, but temporarily ordered joint parenting time and joint decision-making. Clark's appeal of the magistrate's order to this court was dismissed without prejudice because no final order had been entered by the district court.

After a hearing on permanent orders, the trial court concluded that jurisdiction over the initial joint custody proceedings was proper and that, even if that court had lacked jurisdiction, the magistrate could not declare void the joint custody award of a district court judge. Nevertheless, without either relying on the joint custody award or otherwise explaining the basis for its jurisdiction over the parental responsibilities proceedings, the trial court awarded joint parental responsibilities to Clark and McLeod, except in the areas of dental care and religion, where it awarded sole parental responsibilities to Clark. The court also prohibited Clark from exposing E.L.M.C. to "homophobic" religious teachings.

## II. Legal Framework

According to Clark, *Troxel* requires departure from *In re Custody of C.C.R.S.*, 892 P.2d 246 (Colo.1995), which held that, under § 14–

10–123, the best interests of the child standard permits a parental responsibilities dispute between a fit, legal parent and a psychological parent to be resolved in favor of the psychological parent. Clark challenges § 14–10–123 as applied to her, not on its face.

■ As a preliminary matter, McLeod contends "[t]he fact that E.L.M.C.'s psychological parent is the same gender as her adoptive parent is not relevant." For purposes of applying the psychological parent doctrine here, we agree. *See T.B. v. L.R.M.*, 567 Pa. 222, 232, 786 A.2d 913, 918–19 (2001)("[T]he nature of the relationship between Appellant and Appellee has no legal significance to the determination of whether Appellee stands in loco parentis to [Appellant's child]. The ability to marry the biological parent and the ability to adopt the subject child have never been and are not now factors in determining whether the third party assumed parental status and discharged parental duties.").

Although McLeod does not dispute that Clark is E.L.M.C.'s only legal parent and is a fit parent, McLeod further contends that the best interests standard, as applied in *C.C.R.S.*, still controls this case, because she is the child's psychological parent. We uphold the trial court's allocation of equal parental responsibilities to McLeod, but on narrower grounds.

■ We begin with a discussion of *C.C.R.S.* and *Troxel.* We conclude that, although *Troxel* did not specify the standard of review, statutory interference with the constitutional rights of a fit, legal parent should be subjected to strict scrutiny.

## A. *In re Custody of C.C.R.S.*

In *C.C.R.S.*, the supreme court held that the best interests standard was applicable under § 14–10–123 to resolve a custody dispute between a fit, natural parent and potential adoptive parents, whom the court treated as psychological parents because they had cared for the child since birth. The court noted that the child's "best interests," which encompass "physical, mental, and emotional conditions and needs of the child," § 14–10–124(1.5), were of paramount consideration in all custody proceedings. Thus, the court gave priority "to resolv[ing] the dispute in a way that minimizes the detriment to the child." *C.C.R.S., supra*, 892 P.2d at 257–58.

The court recognized the "presumption that the biological parent has a first and prior right to custody," *C.C.R.S., supra*, 892 P.2d at 256, but concluded that unfitness of the natural parent need not be established to award custody to nonparents. Based on the best interests standard, the court upheld the trial court's award of custody to the prospective adoptive parents. It explained that "[r]emoving C.C.R.S. from the parents he has known, with whom he has emotionally bonded, and giving custody to his biological mother, who is virtually a stranger to him, ignores the welfare of the child and is likely to have a detrimental effect on his emotional and psychological well-being." *C.C.R.S., supra*, 892 P.2d at 258.

## B. *Troxel v. Granville*

Five years after the decision in *C.C.R.S.*, the *Troxel* Court considered whether application of Washington's grandparent visitation statute to Granville and her daughters violated Granville's due process right to make decisions concerning the custody, care, and control of her children. The grandparents sought visitation under a Washington statute that provided "any person" could petition for visitation rights at "any time." *Troxel, supra*, 530 U.S. at 61, 120 S.Ct. at 2057. They did not rely on a common law psychological or de facto parent doctrine.

Justice O'Connor, writing for the plurality, began by explaining "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel, supra*, 530 U.S. at 66, 120 S.Ct. at 2060. The plurality noted that in this right inheres a presumption a fit parent will act in the best interests of his or her child.

The plurality held that Washington's visitation statute, as applied to Granville, unconstitutionally infringed on her fundamental

right to direct the upbringing of her daughters. The plurality set forth three reasons supporting its conclusion that no "special factors" existed to justify the state's interference with this fundamental right. *Troxel, supra,* 530 U.S. at 68, 120 S.Ct. at 2061.

First, because parental unfitness was not alleged, Granville was presumed to act in the best interests of her daughters in limiting grandparent visitation. Second, when the court intervened, it gave no special weight to Granville's determination of her daughters' best interests. Third, Granville had not sought to eliminate grandparent visitation entirely, but only to restrict it.

Nevertheless, the *Troxel* plurality declined to address "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation," 530 U.S. at 73, 120 S.Ct. at 2064, and whether parental unfitness was a condition precedent to overriding a parent's determination of the children's best interests. It also declined to define the appropriate level of scrutiny and "the precise scope of the parental due process right in the visitation context." *Troxel, supra,* 530 U.S. at 73, 120 S.Ct. at 2064.

Neither the Colorado Supreme Court nor any division of this court has resolved these questions since *Troxel.* Further, since *Troxel,* no Colorado appellate opinion has decided the constitutional standard for resolving parental responsibility disputes between a legal parent and a psychological parent. *See People in Interest of A.M.K.,* 68 P.3d 563 (Colo.App.2003)(facial challenge to § 14–10–123(1)(b) and (c), C.R.S.2003, not considered because attorney general not notified as required under § 13–51–115, C.R.S.2003; Vogt, J., concurring specially to emphasize the *Troxel* presumption of the legal parent's first and prior right to custody may be rebutted by evidence establishing that the child's welfare is better served by granting custody to a nonparent).

Thus, we must determine the contours of a parent's due process right before resolving whether the Colorado statutes relied on by the trial court here are constitutional as applied.

### C. Level of Scrutiny

While the *Troxel* plurality opinion did not declare all nonparental visitation statutes per se unconstitutional, it cautioned that "so long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State" to interfere with the parent's ability "to make the best decisions concerning the rearing of that parent's children." *Troxel, supra,* 530 U.S. at 68–69, 120 S.Ct. at 2061.

■ Applications for parental responsibilities—parenting time and decision-making responsibilities—by a nonparent implicate the constitutional right to family autonomy and privacy. A "legislative enactment that infringes on a fundamental right is constitutionally permissible only if it is necessary to promote a compelling state interest and does so in the least restrictive manner possible." *In re Custody of C.M.,* 74 P.3d 342, 344 (Colo.App.2002)(citing *Evans v. Romer,* 882 P.2d 1335 (Colo.1994), *aff'd,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)). *See generally Tattered Cover, Inc. v. City of Thornton,* 44 P.3d 1044 (Colo.2002)(for a statute to withstand strict scrutiny when state action has implicated fundamental rights, the state must show a compelling interest).

■ Hence, consistent with *Troxel's* acknowledgment that this right "is perhaps the oldest of the fundamental liberty interests recognized by [the] Court," *Troxel, supra,* 530 U.S. at 65, 120 S.Ct. at 2060, we join those courts that have concluded the strict scrutiny test applies to statutes which infringe on the parent-child relationship. *See Roth v. Weston,* 259 Conn. 202, 789 A.2d 431, 441 (2002)("the application of the strict scrutiny test is required to any infringement [the parent-child relationship] may suffer"); *Blixt v. Blixt,* 437 Mass. 649, 774 N.E.2d 1052, 1059 (2002)(examining grandparent visitation statute and noting that strict scrutiny requires compelling state interest to justify state action and careful examination to ascertain whether the action was "narrowly tailored to further [that] interest"); *Moriarty v. Bradt,* 177 N.J. 84, 827 A.2d 203, 214 (2003)("[W]hen the State seeks, by statute, to

interfere with family and parental autonomy, a fundamental right is at issue. That statute thus is subject to strict scrutiny and will only pass constitutional muster if it is narrowly tailored to serve a compelling state interest.").

We next consider whether the jurisdictional and substantive provisions of §§ 14–10–123, 14–10–123.4, and 14–10–124(1.5), on which the trial court relied, were applied narrowly to achieve a compelling state interest.

### III. Jurisdiction

■ The parties dispute whether the trial court could exercise jurisdiction over McLeod under § 14–10–123(1)(c) of Colorado's Uniform Dissolution of Marriage Act. We conclude the trial court properly found facts consistent with the psychological parent doctrine, as implicitly recognized by this subsection, which appropriately restricts jurisdiction over a nonparent's petition for parental responsibilities to limited circumstances.

The General Assembly has specifically authorized nonparents to seek parental responsibilities. *See* § 14–10–123(1)(b)–(c). "Parental responsibility" includes both "parenting time" and "decision-making responsibilities." Sections 14–10–103(4), 14–10–124(1.5), C.R.S.2003; *In re Marriage of Roosa*, 89 P.3d 524 (Colo.App.2004).

As pertinent here, under § 14–10–123 proceedings may be commenced:

(1)(b) By a person other than a parent, by filing a petition seeking the allocation of parental responsibilities for the child in the county where the child is permanently resident or where the child is found, but only if the child is not in the physical care of one of the child's parents;

(c) By a person other than a parent who has had physical care of a child for a period of six months or more, if such action is commenced within six months of the termination of such physical care.

"Subsection [ (1) ](c), which was adopted later and is not contained in the Uniform Act, implements the Colorado General Assembly's recognition of 'psychological parenting.' " *In re K.M.B.*, 80 P.3d 914, 916 (Colo.App.2003);

*see also C.C.R.S., supra*, 892 P.2d at 252 ("The adoption of this section constitutes legislative recognition of the effects of 'psychological parenting' upon the best interests of a child."); *In re V.R.P.F.*, 939 P.2d 512, 514 (Colo.App.1997)(this "statutory grant of standing to a non-parent to seek [parental responsibilities for] a child constitutes legislative recognition of the importance of 'psychological parenting' to the best interests of a child").

A determination of "physical care" includes "the amount of time a child has spent in the actual, physical possession of a non-parent and the psychological bonds non-parents develop with children who have been in their physical possession and control for a significant period of time." *C.C.R.S., supra*, 892 P.2d at 253 (defining "physical custody," prior to the General Assembly's 1998 amendment changing "physical custody" to "physical care," for purposes of jurisdiction under § 14–10–123(1)(c)).

Under a strict scrutiny analysis, the jurisdictional requirements of subsection (1)(c), which create standing in nonparents, must be applied narrowly. "Where fundamental rights are implicated, such as in the present case, standing serves a function beyond a mere jurisdictional prerequisite. It also ensures that the statutory scheme is narrowly tailored so that a person's personal affairs are not needlessly intruded upon and interrupted by the trauma of litigation." *Roth v. Weston, supra*, 789 A.2d at 442 (considering standard required for legislative intrusions into parent-child relationship arising from a claim by a third party).

Subsection (1)(c) limits jurisdiction to the "class of nonparents who may seek parental responsibilities to only those individuals who have had a recent or continuing role as a caretaker" and thereby "protects against undue interference with the parent-child relationship." *In re K.M.B., supra*, 80 P.3d at 917. Thus, proof of the nature of a parent-like relationship between a person seeking parental responsibilities and the child provides the restrictive jurisdictional safeguards necessary to prevent families from having to defend against unjustified petitions for parental responsibilities. *See Troxel, supra*.

Nevertheless, Clark argues that three additional requirements must be met under subsection (1)(c) before the district court can exercise jurisdiction over a nonparent's petition for parental responsibility: the nonparent must have a legal relationship either to the parent or to the child; the nonparent must petition for responsibilities incident to a dissolution proceeding; and the parent must relinquish, and the nonparent exclusively have, physical care of the child. We reject each of Clark's proposed jurisdictional limits in turn.

## A. Legal Relationship

We first reject Clark's argument that, to commence parental responsibility proceedings under subsection (1)(c), a nonparent must have a legal relationship to the parent or the minor child.

Subsection (1)(c) permits commencement of parental responsibility proceedings "by a person other than a parent." Thus, by its plain terms, subsection (1)(c) establishes that *any* nonparent may commence parental responsibility proceedings so long as the nonparent had physical care of the child for at least six months. It contains no qualifying language such as, "by a person other than a parent, *who has a legal relationship with the parent or child.*" Nonparents "may include friends, relatives, grandparents, step-parents or child-care agencies, or, in other words *any* person or agency other than the child's natural parent." *C.C.R.S., supra,* 892 P.2d at 256 n. 23 (emphasis added)(determining potential adoptive parents' ability to seek parental responsibility under § 14-10-123(1)(b) and (c), quoting 2 Homer H. Clark, *The Law of Domestic Relations in The United States* § 20.6, at 525 (2d ed.1987)); *In re K.M.B., supra* (interpreting the phrase, "by a person other than a parent" in § 14-10-123(1)(b) to include *any* nonparent).

Hence, consistent with the General Assembly's recognition of the psychological parent doctrine, jurisdiction under subsection (1)(c) turns not on the nature of the legal relationships among the parties, but on the quality of the relationship between the nonparent and the child.

Accordingly, we conclude that, by its plain and unambiguous wording, § 14-10-123(1)(c) does not require the nonparent seeking parental responsibilities to have a legal relationship with either the parent or the child. *See In re Marriage of Hannum,* 796 P.2d 57 (Colo.App.1990)(if a statute is explicit and free from ambiguity, there is no room for interpretation or construction beyond giving effect to common and accepted meaning of words employed in the act, and resort should never be had to a strained interpretation).

## B. Incident to Dissolution Proceedings

Clark also argues that McLeod, as a nonparent, could not litigate parental responsibilities because her petition was not incidental to a dissolution proceeding. We disagree.

A nonparent's petition for parental responsibility need not be incidental to the dissolution of marriage. *See In re Davis,* 656 P.2d 42 (Colo.App.1982)(petition for legal custody need not be brought by a parent or be incidental to dissolution of marriage proceeding for court to have jurisdiction under § 14-10-123(1); grandmother and stepfather of child's legal father could petition under § 14-10-123(1)(b) for legal custody of child after death of daughter-in-law).

## C. Exclusive Physical Care

Focusing on the word "the" in the phrase, "the physical care," Clark further argues that McLeod cannot seek parental responsibilities under § 14-10-123(1)(c) because Clark never relinquished, and McLeod never had exclusive, physical care of E.L.M.C. Again, we disagree.

We construe a statute to determine and give effect to the intent of the General Assembly. In interpreting a statute, words and phrases are to be given their plain and ordinary meaning, and a consistent, harmonious, and sensible effect is to be given all its parts. Where "the language of a statute is clear and unambiguous, it must be applied as written, and the court need not resort to other rules of statutory construction." *In re K.M.B., supra,* 80 P.3d at 916.

Subsection (1)(c) permits a nonparent to seek parental responsibilities if he or she has

had "the physical care" of the child for a period of more than six months. This subsection contains no qualifiers, such as "the *exclusive* physical care." Nor does it require, as does subsection (1)(b), that the child not be "in the physical care of one of the child's parents." Had the legislature intended that the nonparent's physical care of the child be in the complete absence of the parent's physical care under subsection (1)(c), it could have so stated. *People in Interest of J.R.T.*, 55 P.3d 217 (Colo.App.2002), *aff'd*, 70 P.3d 474 (Colo.2003).

Accordingly, we conclude that, by its plain language, subsection (1)(c) applies even where the nonparent's physical care of the child is not exclusive of the parent's. *See In re K.M.B., supra*, 80 P.3d at 916–17 (subsection (1)(c) "applies even when the child's parents have retained some measure of caretaking responsibility"); *In re Marriage of Dureno*, 854 P.2d 1352 (Colo.App.1992)(stepfather jurisdictionally capable of litigating custody under § 14–10–123(1) where he had physical custody of the child jointly with his wife); *In re Marriage of Tricamo*, 42 Colo. App. 493, 599 P.2d 273 (1979)(upholding jurisdiction under § 14–10–123(1)(c) over former husband who, while neither the natural nor adoptive parent, had joint physical custody of child with his wife for a number of years).

### D. Petition Within Six Months

As a separate procedural matter, Clark asserts McLeod failed to petition for parental responsibilities within six months of her physical care for E.L.M.C. being terminated. We are not persuaded.

Section 14–10–123 sets forth jurisdictional requirements for the allocation of "parental responsibilities," which, as noted above, include both "parenting time" and "decision-making responsibilities." *In re Marriage of Roosa, supra.* Section 14–10–124(1.5) specifies how a court, which has obtained jurisdiction under § 14–10–123, should allocate, on the motion of either party or on its own motion, parental responsibilities. Thus, McLeod's motion for parenting time under § 14–10–124 seeks parental responsibilities and was filed within six months of her departure from the joint residence. Therefore, McLeod timely moved for parental responsibilities under § 14–10–123(1)(c).

In sum, because the trial court found, with record support, that McLeod provided financial support to and assisted in raising E.L.M.C., we conclude the trial court properly exercised jurisdiction over McLeod's timely motion for parental responsibilities under § 14–10–123(1)(c). *Cf. C.C.R.S., supra*, 892 P.2d at 253 (listing similar factors in "physical custody" determination).

### IV. Allocation of Parental Responsibilities

■ We now turn to whether, under §§ 14–10–123, 14–10–123.4, and 14–10–124(1.5), the trial court's findings reflect sufficiently compelling reasons to warrant interference with Clark's parenting plan, notwithstanding her constitutional rights as the child's sole, and fit, legal parent. We conclude they do.

■ "Axiomatic to the exercise of judicial authority is the principle that a court should not decide a constitutional issue unless and until [the] issue is actually raised by a party to the controversy and the necessity for such decision is clear and inescapable." *People v. Lybarger*, 700 P.2d 910, 915 (Colo.1985); *see also People v. Bossert*, 722 P.2d 998 (Colo. 1986). Hence, our role in reviewing the constitutionality of a statute as applied must necessarily be limited by the facts in the case before us, as informed by federal and Colorado law. *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)(an appellate court should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied).

We begin with a review of the limits a state can impose on a fit parent's fundamental liberty interest in the parent-child relationship, as recognized by the United States Supreme Court. Next, we consider various tests enunciated by other jurisdictions since *Troxel* concerning parental unfitness, harm to the child, and psychological parenthood. Finally, we turn to Colorado law concerning

a psychological parent's role in the best interests of the child and conclude that the particular findings before us show a compelling interest to implement a parenting plan different from Clark's.

We reject Clark's contention that a showing of her unfitness was required before parental responsibilities could be allocated to McLeod. We need not answer Clark's further argument that the child's best interests alone are inadequate to support a grant of parental responsibilities to a nonparent, over the objection of a fit, legal parent, because the trial court found facts showing that McLeod was E.L.M.C.'s psychological parent from birth, a relationship Clark consented to and encouraged but then sought to restrict significantly, thus threatening emotional harm to E.L.M.C.

### A. Federal Constitutional Considerations

■ The family is not beyond state regulation. *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). Limits on a parent's fundamental right to control the child's upbringing arise out of the state's interest as *parens patriae* ("parent of the country"). Thus, a state may exercise its *parens patriae* authority to guard children against imminent physical harm. *See, e.g., Prince v. Massachusetts, supra,* 321 U.S. at 166–67, 64 S.Ct. at 442 (recognizing when circumstances place child in imminent danger, or affect the child's well-being, state could properly intrude on that "private realm of family life" to protect child from harm).

Harm in this traditional sense is not, however, the only compelling state interest when the welfare of children is at issue. For example, the state's compelling interest in requiring school attendance or restricting child labor does not derive exclusively from the state's interest in preventing harm, but instead stems from the state's broader *parens patriae* interest in the well-being of children. *See Parham v. J.R.,* 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101 (1979)("Nonetheless, we have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is

jeopardized."); *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

Nor will the Fourteenth Amendment procedural due process rights of a child's biological parent always outweigh those of other parties asserting parental rights. For example, in *Quilloin v. Walcott,* 434 U.S. 246, 256, 98 S.Ct. 549, 555, 54 L.Ed.2d 511, 520 (1978), a biological parent's constitutional rights were accorded less weight than those of a married, but neither biological nor adoptive, father who had "borne full responsibility for the rearing of his children during the period of the marriage" where the biological parent "never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child." *See also Lehr v. Robertson,* 463 U.S. 248, 259–60, 103 S.Ct. 2985, 2992, 77 L.Ed.2d 614 (1983)(biological father's mere genetic relationship to child did not allow him to block a nonbiological parent's adoption because of the "clear distinction between a mere biological relationship and an actual relationship of parental responsibility"); *cf. Smith v. Org. of Foster Families for Equality & Reform,* 431 U.S. 816, 844, 97 S.Ct. 2094, 2109, 53 L.Ed.2d 14 (1977)(emotional bond between child and foster parents required that foster parents be afforded minimum due process rights before removal of children from foster home; "the importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot(ing) a way of life' through the instruction of children as well as from the fact of blood relationship"; quoting *Wisconsin v. Yoder,* 406 U.S. 205, 231–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972)).

Further, under certain circumstances, even the existence of a developed biological parent-child relationship will not prevent nonparents from acquiring parental rights vis-a-vis the child. *See, e.g., Troxel,* 530 U.S. at 68, 120 S.Ct. at 2061 ("special factors ... might justify the State's interference with [the biological mother's] fundamental right to make decisions concerning the rearing of her [children]"); *Michael H. v. Gerald D.,* 491

U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989).

In *Michael H.*, the Supreme Court held that, despite both biological parenthood and an established relationship with his young child, the father's substantive due process right to maintain some connection with the child was not sufficient to overcome California's presumption that the husband of the child's mother was the child's parent. Thus, the Court recognized that a developed relationship within a family unit between a non-biological parent and a child may, under certain circumstances, warrant more legal protection by a state than the equally developed relationship between the child and the biological parent outside the family unit. *See also In re Marriage of Ohr*, 97 P.3d 354, 2004 WL 1469405 (Colo.App. No. 03CA0726, July 1, 2004)(discussing *Michael H.* and noting that "once legal fatherhood has been determined to reside elsewhere, a biological father has no constitutional right of visitation or association with a child; for all intents and purposes, the biological father is a nonparent").

However, this broadened concept of family is not dispositive of our analysis because, as previously indicated, *Troxel* did not resolve exactly what compelling state interests subordinate the substantive due process rights and attendant presumptions accorded a fit, legal parent in a dispute with a nonparent over parental responsibilities.

## B. Parental Unfitness and Harm

A number of jurisdictions considering nonparents' assertions of parental rights, including Colorado, reject a requirement that a parent be found unfit before interfering with the parent's parenting plan. *See Downs v. Scheffler*, 206 Ariz. 496, 80 P.3d 775 (Ct.App. 2003); *C.C.R.S., supra* (rejecting parental unfitness standard in favor of the best interests of the child test in contest between biological mother and psychological parents); *Roth v. Weston, supra; Rideout v. Riendeau,* 761 A.2d 291 (Me.2000); *Blixt v. Blixt, supra; Moriarty v. Bradt, supra; Williams v. Williams,* 132 N.M. 445, 50 P.3d 194 (Ct.App. 2002); *see also Wilson v. Mitchell*, 48 Colo. 454, 465, 111 P. 21, 25 (1910)(while natural parents have a first and prior right to custody, no requirement that custody be awarded to parent or parents merely because the evidence shows fitness and ability to care for child; controlling factor is welfare of the child).

Further, *Troxel* did not decide whether a finding of unfitness is a condition precedent to recognizing rights of a nonparent. *See People in Interest of A.M.K., supra* (rejecting father's argument that unfitness must be shown to interfere with fundamental right to direct upbringing of child); *In re R.A.,* 66 P.3d 146 (Colo.App.2002)(adhering to rejection of unfitness standard in *C.C.R.S.*, notwithstanding *Troxel* ).

Hence, we are persuaded by the view that, despite *Troxel*, parental unfitness need not be shown.

A number of jurisdictions applying strict scrutiny analysis to their nonparental visitation statutes also require a showing of actual or threatened physical or emotional harm to the child, thus implicitly requiring more than bare best interests. *See Evans v. McTaggart*, 88 P.3d 1078 (Alaska 2004)(to overcome parental preference for custody of child, nonparent must show parent is unfit or that welfare of child requires placement in custody of nonparent); *Roth v. Weston, supra* (requiring substantial emotional harm to justify court intervention); *Beagle v. Beagle,* 678 So.2d 1271 (Fla.1996)(state can satisfy compelling interest required under state constitution when acting to prevent harm); *Brooks v. Parkerson,* 265 Ga. 189, 454 S.E.2d 769, 773 n. 5 (1995)("[T]he 'best interest of the child' standard does not come into play to permit interference with the custody and control of the child, over parental objection, unless and until there is a showing of harm to the child without that interference."); *Moriarty v. Bradt, supra* (requiring threat of harm to child's welfare to infringe on right of parents to raise their children as they see fit); *In re Herbst,* 971 P.2d 395, 399 (Okla. 1998)("To reach the issue of a child's best interests, there must be a requisite showing of harm, or threat of harm.... Absent a showing of harm (or threat thereof) it is not for the state to choose which associations a family must maintain and which the family is

permitted to abandon."); *Hawk v. Hawk,* 855 S.W.2d 573, 580 (Tenn.1993)(requiring "an initial showing of harm ... before the state may intervene to determine the 'best interests of the child'"); *Williams v. Williams,* 256 Va. 19, 501 S.E.2d 417, 418 (1998)(quoting Virginia Court of Appeals decision, 24 Va.App. 778, 485 S.E.2d 651, 654 (1997), in same case: "[B]efore visitation can be ordered over the objection of the child's parents, a court must find an actual harm to the child's health or welfare without such visitation. A court reaches consideration of the 'best interests' standard in determining visitation only after it finds harm if visitation is not ordered.").

Moreover, in cases involving a fit, legal parent's constitutional rights, the best interests of the child standard has been criticized as indeterminate, thus leading to unpredictable results. *See Roth v. Weston, supra.* Indeed, *Troxel* cautions that a judge should not find the presumption that a parent acts in the child's best interests rebutted merely because the judge believes a "better decision" could be made.

As the Maine Supreme Court noted:

What is best for children depends upon values and norms upon which reasonable people differ. Broad room for debate means a broad and unpredictable array of possible outcomes in any custody contest. That fact encourages prolonged and expensive litigation and "strategic behaviors" of the parents, neither of which usually benefits children.

*Rideout v. Riendeau, supra* at 296 n. 5 (quoting Honorable John C. Sheldon, *Anticipating the American Law Institute's Principles of the Law of Family Dissolution,* 14 Me. B.J. 18, 25 (1999) (citations omitted)).

However, contrary authority exists. *See, e.g., State v. Paillet,* 270 Kan. 646, 16 P.3d 962 (2001)(due process requirements met under statute that requires presumption that fit parent acts in best interest of child and places burden to show otherwise on petitioner); *Zeman v. Stanford,* 789 So.2d 798, 804 (Miss.2001)(noting that "best interest of the child" is paramount consideration); *State ex rel. Brandon L. v. Moats,* 209 W.Va. 752, 762–63, 551 S.E.2d 674, 684 (2001)(concluding that two-prong standard of best interests of child and lack of substantial interference with parents' right meets *Troxel* requirements).

Indeed, the Colorado Supreme Court has continued to emphasize that "the overarching goal in all adoption and custody proceedings is the best interests of the child." *People in Interest of A.J.C.,* 88 P.3d 599, 604 (Colo. 2004); *see also N.A.H. v. S.L.S., supra,* 9 P.3d at 366 (noting that the General Assembly has defined the best interests of the child under § 14–10–124 and that "when presumptions of paternity arise in more than one potential father, trial courts must take the best interests of the child into account as part of policy and logic in resolving competing presumptions"). However, since *Troxel* the court has not applied the best interests test to resolve a parental responsibilities dispute between a fit, legal parent and a nonparent.

In such cases, use of the best interests test to discern a compelling state interest could be problematic. On the one hand, every ruling on parental responsibilities that protects a child from harm also furthers the child's best interests. *See* § 14–10–124(1.5)(paramount consideration given to "physical, mental, and emotional conditions and needs of the child"). On the other hand, however, not all best interests determinations are necessary to avoid harm. *See Rideout v. Riendeau, supra,* 761 A.2d at 310 (the best interests standard "delegates to judges authority to apply their own personal and essentially unreviewable lifestyle preferences to resolving each dispute").

■ Accordingly, we further conclude that, consistent with existing federal limitations on a parent's fundamental right to direct the upbringing of the child, proof that a fit parent's exercise of parental responsibilities poses actual or threatened emotional harm to the child establishes a compelling state interest sufficient to permit state interference with parental rights. Hence, we do not determine whether a showing of actual or threatened emotional harm is necessary in every case to establish such a compelling state interest.

## C. The Psychological Parent Doctrine and Harm

The importance of a psychological parent to the child has long been considered in applying Colorado's best interests of the child standard. *C.C.R.S., supra* (determining in a custody contest between biological parents and psychological parents, best interests of child standard is prevailing determination); *Root v. Allen,* 151 Colo. 311, 377 P.2d 117 (1962)(if child were to leave her psychological father with whom she lived for many years, effect would be very damaging); *Devlin v. Huffman,* 139 Colo. 417, 339 P.2d 1008 (1959)(grandparents who had physical custody of children for six months awarded custody based on best interests of child); *Coulter v. Coulter,* 141 Colo. 237, 347 P.2d 492 (1959)(paternal grandmother awarded custody over natural, fit mother); *In re K.M.B., supra* (recognizing benefits of psychological parent to child); *In re Marriage of Martin,* 42 P.3d 75 (Colo.App.2002)(defining psychological parent and noting potential for harm to child in break-up of relationship). *See generally* § 14-10-123.4 (a child has a statutory right to have parental responsibilities allocated in its best interests); § 14-10-124(1.5) (trial court must consider all relevant factors, including those enumerated in the statute).

Courts in other jurisdictions faced with custody disputes between natural or legal parents and nonparents similarly recognize the psychological parent doctrine, based on the importance of a child's maintaining emotional attachments to long-term, but legally unrelated, caretakers and hold that custody should be decided in the way which avoids harm arising from disruption of that relationship. *Carter v. Brodrick,* 644 P.2d 850 (Alaska 1982)(acknowledging that stepparents who stand in loco parentis have ability to petition for visitation); *Simpson v. Simpson,* 586 S.W.2d 33 (Ky.1979)(parent who stands in loco parentis may petition for custody); *E.N.O. v. L.M.M.,* 429 Mass. 824, 711 N.E.2d 886 (1999)(trial court had jurisdiction to award visitation between child and de facto parent; lesbian couple planned a pregnancy together, supported each other during the pregnancy and childbirth, gave child both of their last names, and raised child as their own for several years, expressing publicly that the child had two mothers); *V.C. v. M.J.B.,* 163 N.J. 200, 748 A.2d 539 (2000)(same-sex partner of biological mother who had assumed a parental role in helping to raise the biological mother's child had established a "psychological parenthood" with respect to child and thus had legal right to petition for custody and visitation); *State ex rel. J.W.F.,* 799 P.2d 710, 714 (Utah 1990)("[T]he fact that a person is not a child's natural or legal parent does not mean that he or she must stand as a total stranger to the child where custody is concerned. Certain people, because of their relationship to a child, are at least entitled to standing to seek a determination as to whether it would be in the best interests of the child for them to have custody."); *In re Parentage of L.B.,* 89 P.3d 271, 280 (Wash.Ct.App.2004)("Washington courts often have recognized that parent-child bonds form regardless of biology or statutes providing traditional parental rights" and likewise recognize the importance of the psychological bond between a child and caregiver); *In re Custody of H.S.H.-K.,* 193 Wis.2d 649, 533 N.W.2d 419 (1995)(outlining four-prong test for establishing de facto parent relationship; equitable authority to consider petition by woman who had helped her same-sex partner to conceive and raise child after couple separated if petitioner proved existence of parent-like relationship with child and a triggering factor, such as denial of all visitation with child).

Who may be deemed a psychological parent for the purposes of seeking and receiving an award of parental responsibilities has been variously defined. Common to these definitions is a relationship with deep emotional bonds such that the child recognizes the person, independent of the legal form of the relationship, as a parent from whom they receive daily guidance and nurturance.

A division of this court has defined "psychological parent" as "someone other than a biological parent who develops a parent-child relationship with a child through day-to-day interaction, companionship, and caring for the child." *In re Marriage of Martin, supra,*

42 P.3d at 77–78 (citing Joseph Goldstein et al., *The Best Interests of the Child: The Least Detrimental Alternative* 11–13, 104, 105 (1996)).

Again, other jurisdictions are in accord. *See Carter v. Brodrick, supra,* 644 P.2d at 853 n. 2 (quoting Gruenberg & Mackey, *A New Direction for Child Custody in Alaska,* 6 U.C.L.A.-Alaska L.Rev. 34, 36 (1976): A psychological parent is "one who, on a day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological need for an adult. This adult becomes an essential focus of the child's life, for he is not only the source of the fulfillment of the child's physical needs, but also the source of his emotional and psychological needs."); *C.E.W. v. D.E.W.,* 845 A.2d 1146, 1152 (Me.2004)(declining to ultimately define de facto parent, but noting "it must surely be limited to those adults who have fully and completely undertaken a permanent, unequivocal, committed, and responsible parental role in the child's life"); *E.N.O. v. L.M.M., supra,* 711 N.E.2d at 891 ("The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions at least as great as the legal parent [and] shapes the child's daily routine, addresses his developmental needs, disciplines the child, provides for his education and medical care, and serves as a moral guide." (citation omitted)).

Some courts have set forth a more specific four-factor test to determine whether a nonparent is a psychological parent: (1) the legal parent consented to and fostered the nonparent's formation and establishment of a parent-like relationship between the nonparent and the child; (2) the nonparent and the child lived together in the same household; (3) the nonparent assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation, and (4) the nonparent has established a parental role sufficient to create with the child a bonded, dependent relationship parental in nature. *See V.C. v. M.J.B., supra; Rubano v. DiCenzo,* 759 A.2d

959 (R.I.2000); *In re Custody of H.S.H.-K., supra.*

These four factors ensure that a nonparent's eligibility for psychological parent treatment with respect to an unrelated child will be strictly limited. The first factor contains an estoppel-like element and recognizes that, where a legal parent has fostered a parent-like relationship between her child and a nonparent, "the right of the legal parent '[does] not extend to erasing a relationship between her partner and her child which she voluntarily created and actively fostered simply because after the party's [sic] separation she regretted having done so.'" *V.C. v. M.J.B., supra,* 748 A.2d at 552 (quoting *J.A.L. v. E.P.H.,* 453 Pa.Super. 78, 682 A.2d 1314, 1322 (1996))(legal parent has absolute ability to maintain zone of autonomous privacy for herself and her family; fundamental right protecting against state interference in parent-child relationship is personal to the parent, and that protection may be diminished by the parent's actions); *see also Rubano v. DiCenzo, supra,* 759 A.2d at 976 (when legal parent allows third party to assume an equal role as one of the child's two parents, she renders her own parental rights with respect to the minor child "less exclusive and less exclusory" than they otherwise would have been).

The additional elements further protect the legal parent against claims by neighbors, caretakers, baby sitters, nannies, au pairs, nonparental relatives, and family friends. *Rubano v. DiCenzo, supra* (discussing *V.C. v. M.J.B., supra*); *see also Troxel, supra* (expressing concern about the burden of litigating unreasonable intrusions into the traditional parent-child relationship).

Moreover, inherent in the bond between child and psychological parent is the risk of emotional harm to the child should that relationship be significantly curtailed or terminated. *See C.C.R.S., supra,* 892 P.2d at 258 (disrupting emotional bonds between child and psychological parents "would likely prove devastating to the child and would result in long-term, adverse psychological effects on the child"); *Root v. Allen, supra,* 151 Colo. at 314, 377 P.2d at 119 ("It is unmistakably important that children have a sense of conti-

nuity, or otherwise stated, that they are [able] to avoid the damages which result from serious separations. This need that a child has for continuity, the need to avoid separation, is particularly marked at certain times in life."); *Coulter v. Coulter, supra,* 141 Colo. at 241, 347 P.2d at 494 (quoting *Hochheimer's Custody of Infants* 29: "when the power of the court is invoked to place an infant into the custody of its parents and to withdraw such child from other persons, the court will scrutinize all the circumstances and ascertain 'if a change of custody would be disadvantageous to the infant' "); *In re K.M.B., supra* (recognizing benefits of psychological parent to child); *People in Interest of E.C.,* 47 P.3d 707, 710 (Colo.App. 2002)("In determining a child's best interests in a custody proceeding, the trial court may consider the child's psychological attachment to potential caregivers and the potential harm the child may sustain if the attachment is severed."); *In re Marriage of Martin, supra,* 42 P.3d at 78 (citing Goldstein, *supra,* 11–13, 104, 105; "[o]nce this [psychological parent] bond forms, many psychologists believe that breaking up the relationship would be harmful to a child's emotional development").

This deep concern about emotional harm to the child as a result of separation from a psychological parent is echoed by other jurisdictions. *Roth v. Weston, supra,* 789 A.2d at 445 ("when a person has acted in a parental-type capacity for an extended period of time, becoming an integral part of the child's regular routine, that child could suffer serious harm should contact with that person be denied or so limited as to seriously disrupt that relationship"); *Rideout v. Riendeau, supra,* 761 A.2d at 301 ("The cessation of contact with a grandparent whom the child views as a parent may have a dramatic, and even traumatic, effect upon the child's well-being. The State, therefore, has an urgent, or compelling, interest in providing a forum for those grandparents having such a 'sufficient existing relationship' with their grandchildren."); *Youmans v. Ramos,* 429 Mass. 774, 711 N.E.2d 165, 173 n. 20, 174 (1999)(recognizing a child's vulnerability when the bonds with an adult who acts as a de facto parent are broken; "The damage to the child, who cannot understand what is happening, from breaking these bonds is something which even competent psychiatrists may be unable to predict.... [S]uch a breach should not be permitted lightly at the request of [a parent] ... who [herself] created the unfortunate situation."); *V.C. v. M.J.B., supra,* 748 A.2d at 552 ("the ending of the relationship between the legal parent and the third party does not end the bond that the legal parent fostered and that actually developed between the child and the psychological parent").

In sum, narrower definitions of "psychological parent" are useful to restrict the class of nonparents who may seek parental rights. However, even under a broader definition, such as the division adopted in *In re Marriage of Martin, supra,* denial or significant limitation of contact with a psychological parent creates an inherent risk of harm to a young child's emotional well-being. *See Root v. Allen, supra.*

▮ Accordingly, and without precisely defining all attributes of a psychological parent, we further conclude that emotional harm to a young child is intrinsic in the termination or significant curtailment of the child's relationship with a psychological parent under any definition of that term.

### D. Trial Court Findings and Record

Here, because Clark is exercising a constitutional parental right and, under present law, McLeod is not, they do not stand before us on equal footing. Hence, to interfere with Clark's constitutional right to parent E.L.M.C., as embodied in her parenting plan, we must determine whether the findings show a compelling state interest. We conclude the requisite showing has been made.

The trial court applied the best interests standard and incorporated all relevant factors, consistent with § 14–10–124(1.5)(a) and (b). In doing so, the trial court specifically followed *Troxel* by according weight to the presumption that Clark, as a fit parent, was acting in E.L.M.C.'s best interests.

However, the court further found, with record support, clear and convincing evi-

dence of "special factors," that Clark participated in creating: Clark, by filing for joint custody, requested coparenting responsibilities with McLeod; Clark petitioned to change the child's name to reflect the importance of McLeod in E.L.M.C.'s life; Clark entered into a plan for joint parenting of E.L.M.C. with McLeod; Clark permitted McLeod jointly to parent E.L.M.C. and actively encouraged McLeod's participating in raising E.L.M.C.; E.L.M.C. equally recognizes both parties as her parents; and under the parties' initial joint parenting arrangement and the later temporary order of equal parental responsibility, E.L.M.C. was doing extremely well both academically and socially.

The trial court did not specifically find either that McLeod was a "psychological parent" or that termination of the relationship would "harm" E.L.M.C. Nevertheless, we discern no need for further findings on either issue. *Cf. Borer v. Lewis*, 91 P.3d 375 (Colo.2004)(upholding lower court's order setting aside default judgment based on incorrect preponderance of the evidence standard because record supported order under correct clear and convincing evidence standard).

Based on the trial court's findings, which enjoy ample record support, McLeod meets even the most stringent definition of a psychological parent: Clark consented to and fostered McLeod's parent-like relationship with E.L.M.C.; McLeod and E.L.M.C. lived together in the same household for seven and one-half years; McLeod assumed the obligations of parenthood by taking significant responsibility for E.L.M.C.'s development, including contributing towards her support, without expectation of financial compensation; and McLeod established a parental role sufficient to create with E.L.M.C. a bonded, dependent relationship parental in nature, whereby E.L.M.C. recognizes McLeod as her mother. *See V.C. v. M.J.B., supra.*

Thus, the trial court's order granting McLeod's equal parental responsibilities is far more than a judge's mere "better decision" as to the child's best interests. *Troxel, supra,* 530 U.S. at 73, 120 S.Ct. at 2064. Here, given the duration and continuity of McLeod's relationship with E.L.M.C. and her age, proof of the close and substantial relationship between McLeod and E.L.M.C. and proof of threatened emotional harm to the child should parental responsibilities be denied to McLeod are, in effect, two sides of the same coin. *See Roth v. Weston, supra.*

Accordingly, we conclude that, in light of the overwhelming evidence showing McLeod had become a psychological parent, whom E.L.M.C. recognized almost from birth, the curtailment and later termination of McLeod's parental responsibilities in Clark's proposed parenting plan threatened emotional harm to E.L.M.C., which was forestalled by temporary orders granting equal parental responsibilities. Further, we conclude that for purposes of permanent orders this threatened harm both rebutted the *Troxel* presumption in favor of Clark and constituted a compelling state interest justifying court modification of her parenting plan. *See C.C.R.S., supra* (noting that a custodial dispute should be resolved in the least damaging manner to the child).

We reject Clark's suggestion that, if we affirm the trial court's holding, any adult who has "bonded" with a child—whether a nanny or other caregiver—may obtain parental responsibilities. Along with other courts, we recognize the vast difference between the relationship of a child and a psychological parent, as McLeod is to E.L.M.C., and that of a child and a nanny. "Summarily removing a child from her [psychological] parent ... is different in kind from terminating the employment of a nanny." *Youmans v. Ramos, supra,* 711 N.E.2d at 171. A critical component of that difference is the nanny's expectation of compensation. *See, e.g., Rubano v. DiCenzo, supra.*

Accordingly, we do no violence to Clark's constitutional rights when we uphold the joint parental responsibilities order.

## V. Religious Upbringing

 Finally, Clark contends the trial court violated the United States and Colorado Constitutions in ordering that, although Clark would be "awarded sole parental responsibility ... in the area of religion," she

would be required to "make sure that there is nothing in the religious upbringing or teaching that the minor child is exposed to that can be considered homophobic." The court neither defined "homophobic" nor found that exposure to homophobic teachings would either endanger E.L.M.C.'s physical health or significantly impair her emotional development. We conclude that remand for further findings is necessary on both constitutional and statutory grounds.

The First Amendment to the United States Constitution, applicable to the states by virtue of the Due Process Clause of the Fourteenth Amendment, and article II, § 4 of the Colorado Constitution guarantee the free exercise of religion. *In re Marriage of Short*, 698 P.2d 1310 (Colo.1985). These provisions are subject to similar analysis. *See Young Life v. Div. of Employment & Training*, 650 P.2d 515 (Colo.1982).

■ While "[c]ourts are precluded by the free exercise of religion clause from weighing the comparative merits of the religious tenets of the various faiths or basing [their] custody decisions solely on religious considerations," the family "is not beyond regulation in the public interest as against a claim of religious liberty, and neither the rights of religion nor rights of parenthood are beyond limitation." *In re Marriage of Short, supra*, 698 P.2d at 1312–13. Thus, "evidence of beliefs or practices which are reasonably likely to cause present or future harm to the child is admissible in a custody proceeding." *In re Marriage of Short, supra*, 698 P.2d at 1313.

When parental responsibilities have been determined, § 14–10–130(1) allows the person with decision-making responsibility to determine "the child's upbringing, including his or her ... *religious training*, unless the court, after hearing and upon motion by the other party, finds that, in the absence of a specific limitation of the person's ... decision-making authority, the child's physical health would be endangered or the child's emotional development significantly impaired" (emphasis added).

In *In re Marriage of Oswald*, 847 P.2d 251 (Colo.App.1993), the trial court granted the children's grandmother visitation and allowed her to take the children to her church each Sunday, over objection of their mother, who had custody. Citing § 14–10–130(1) and the absence of any "suggestion whatsoever that the children's mental or physical health was at risk," a division of this court held that the trial court had "improperly interfered with mother's right to determine her children's religious training." *In re Marriage of Oswald, supra*, 847 P.2d at 253; *see also In re Marriage of Jaeger*, 883 P.2d 577 (Colo.App.1994)(rejecting noncustodial father's First Amendment challenge to trial court order granting mother's request that child receive counseling from a mental health professional who was not a member of father's faith).

Courts in other states, which have not addressed the issue by statute, similarly recognize that harm to the child must be shown before a custodial parent's constitutional right to determine the child's religious upbringing can be restricted in resolving a custody dispute. *See generally* Annotation, *Religion as Factor in Child Custody and Visitation Cases*, 22 A.L.R.4th 971 (1983); *see also* George L. Blum, Annotation, *Religion as Factor in Visitation Cases*, 95 A.L.R.5th 533 (2002).

For example, in *Kendall v. Kendall*, 426 Mass. 238, 687 N.E.2d 1228 (1997), a mother, who had adopted Orthodox Judaism, sought to limit exposure of the children to the father's fundamentalist Christian faith, although the father enjoyed joint custody. The court considered "[t]he determinative issue [to be] whether the harm found to exist in this case [is] so substantial so as to warrant a limitation on the [father's] religious freedom." *Kendall, supra*, 687 N.E.2d at 1232. The court noted that the requisite substantial harm had been demonstrated in very few cases.

The *Kendall* court upheld a general restriction against indoctrinating the children "in a manner which substantially promotes their ... alienation from either parent or their rejection of either parent," and a specific prohibition against the father's sharing his religious beliefs—that persons "who do not accept Jesus Christ ... are destined to burn in hell"—with the children "if those beliefs

cause the children significant emotional distress or worry about their mother or about themselves." *Kendall, supra,* 687 N.E.2d at 1231. The court explained that the restriction "was intended for a wholly secular purpose—to limit the emotional harm to the children caused by exposure to negative messages presented by the [father's] religion." *Kendall, supra,* 687 N.E.2d at 1236; *see also MacLagan v. Klein,* 123 N.C.App. 557, 473 S.E.2d 778 (1996)(despite joint custody, order giving father sole control over child's religious training upheld because, since mother introduced child to activities at her church, child had experienced stress and anxiety from exposure to conflicting religions), *overruled in part by Pulliam v. Smith,* 348 N.C. 616, 501 S.E.2d 898 (1998).

Courts have applied a similar analysis in limiting a custodial parent's involvement of the child in door-to-door religious solicitation. *Compare Morris v. Morris,* 271 Pa.Super. 19, 34, 412 A.2d 139, 146 (1979)(restricting parent's involvement of child in door-to-door religious solicitation that "would probably, although not necessarily, result in some psychological impairment"), *with Palmer v. Palmer,* 249 Neb. 814, 545 N.W.2d 751 (1996)(rejecting limitation on door-to-door solicitation that posed no immediate and substantial threat to the child's mental or physical health).

Here, the trial court observed that Clark and McLeod "will never be able to agree regarding the religious upbringing of the minor child" and awarded Clark "sole parental responsibility" concerning religion. Thus, Clark is "the person . . . with responsibility for decision-making" within the meaning of § 14–10–130(1).

We note that *Random House Webster's Unabridged Dictionary* 916 (2d ed.1998), defines "homophobia" as the "unreasoning fear of or antipathy toward homosexuals and homosexuality." Another dictionary defines "homophobia" as "irrational hatred or fear of homosexuals or homosexuality." *Webster's New World College Dictionary* 684 (4th ed.1999).

The parties present no authority describing homophobia in terms of religious doctrine. Nevertheless, we must address the trial court's pairing of its restriction on homophobic teachings with E.L.M.C.'s religious upbringing because courts have no jurisdiction over "quintessentially religious controversies." *Van Osdol v. Vogt,* 908 P.2d 1122, 1132 (Colo.1996)(quoting *Serbian E. Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 720, 96 S.Ct. 2372, 2385, 49 L.Ed.2d 151 (1976)).

We review the legal standard applied by a trial court de novo. *People in Interest of J.R.T., supra.* Here, however, we cannot determine from the findings whether the trial court applied the correct standard in limiting Clark's right to determine the child's religious upbringing. *See In re Marriage of Jensen–Branch,* 78 Wash.App. 482, 899 P.2d 803 (1995)(while evidence may have shown actual or potential harm to children from parental conflict over religious upbringing, remand was required to resolve whether trial court had considered constitutional issues and lesser restrictions on rights of custodial parent).

Although McLeod argues this restriction is a mere nondisparagement clause, we cannot uphold it on this basis because it is not so described in the trial court's order. Nor is it mutual.

Hence, given the important role that religious freedom enjoys in our constitutional scheme of ordered liberty, *Bowen v. Roy,* 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), and the mandate of § 14–10–130(1), we conclude that remand is necessary.

Considering the passage of time since the permanent orders hearing, the trial court may choose to hold a new hearing focused on "the current status of the parties . . . in light of the standards announced in this opinion." *In re Marriage of Short, supra,* 698 P.2d at 1313. The court also may conclude that the existing record is sufficient to make further findings regarding the religious upbringing restriction.

Clark does not assert, and we do not address, amicus Liberty Counsel's argument that lack of a definition of "homophobic" in the order creates a constitutional problem of vagueness and overbreadth. However, Clark may present this issue to the trial court on

remand, in the context of the court's additional findings.

The order is affirmed as to joint parental responsibilities and parenting time. The order is vacated as to limitations on religious upbringing, and the case is remanded to the trial court for further proceedings, consistent with this opinion, under § 14–10–130(1).

Judge NIETO and Judge RUSSEL concur.